The Renovator's Supply, Inc. *vs.* Sovereign Bank.

No. 06-P-1938.

Franklin. November 19, 2007. - August 26, 2008.

Present: Berry, Meade, & Sikora, JJ.

*Bank. Estoppel. Consumer Protection Act,* Bank, Unfair or deceptive act, Damages. *Contract,* Implied covenant of good faith and fair dealing, Damages. *Damages,* Breach of contract, Consumer protection case, Loss of profits.

In a civil action for recovery of profits lost after the defendant bank, three days after the expiration of the plaintiff's line of credit, declined to renew that line of credit without an increase in the interest rate charged and the imposition of a lien, the judge correctly concluded that the bank was equitably estopped from terminating the line of credit without reasonable notice, where, by its comments and particularly by its conduct, the bank led the plaintiff to believe that the renewal of the line of credit under the same conditions as it had enjoyed previously was assured [426-428]; further, the judge properly concluded that the bank had acted in an unfair or deceptive manner in violation of G. L. c. 93A, §§ 2 and 11, by exploiting the timing of its decision not to renew in an attempt to force unwanted additional credit terms on the plaintiff [428-431], and that this conduct was wilful and deliberate, thereby entitling the plaintiff to compensatory damages, the doubling of damages, and an award of reasonable attorney's fees and costs [431-432]; however, the judge erred in concluding that the bank's termination of the line of credit violated the implied covenant of good faith and fair dealing, where the contract for the line of credit contained no provision for notice of nonrenewal [433-434].

In a civil action for recovery of lost profits arising from the defendant bank's declining to renew the plaintiff's line of credit without the imposition of additional credit terms, the judge correctly concluded that the bank's action caused the losses, where the plaintiff's decision to eliminate the mailing of holiday catalogs in the face of the nonrenewal was a rational decision to conserve cash for ongoing operations, and where the disruption of the holiday catalog mailing was reasonably foreseeable to the bank. [434-435]

In a civil action for recovery of lost profits arising from the defendant bank's declining to renew the plaintiff's line of credit without the imposition of additional credit terms, the judge's formula for measuring damages contained an element of unreliability, and therefore, this court remanded the matter for further proceedings. [435-437]

This court awarded reasonable appellate fees and costs to a litigant that successfully maintained a G. L. c. 93A judgment in its favor. [437]

CIVIL ACTION commenced in the Superior Court Department on April 10, 2003.

The case was heard by *John A. Agostini*, J.

*Dennis E. McKenna* for the defendant.

*Joseph H. Skerry, III*, for the plaintiff.

SIKORA, J. This appeal presents issues of fair dealing between a lender bank and a commercial customer. The plaintiff, The Renovator's Supply, Inc. ("Renovator" or "the company"), maintained a contractual line of credit with the defendant, Sovereign Bank ("Sovereign" or "the lender" or "the bank"). Since the beginning of a relationship in 1997 with Sovereign's predecessor, Fleet Bank, Renovator had annually renewed its credit arrangement with the lender.

In 2002, Sovereign concluded that Renovator presented a heightened credit risk. At 5:00 P.M. three days after the expiration date of the contract, Sovereign informed Renovator for the first time that it would not renew the line of credit unless Renovator agreed to a one percent interest rate increase and an all business asset lien. Renovator found those terms unsatisfactory, declined to enter into a new loan agreement, and proceeded to operate for an interim without alternate financing. It alleged that Sovereign's failure to provide reasonable notice of the new credit terms inflicted unfair surprise, operating hardship, and a resulting loss of substantial short-term profits.

After a four-day, jury-waived trial, a judge of the Superior Court found and ruled that Sovereign's conduct had violated the standards of equitable estoppel, the implied covenant of good faith and fair dealing, and the prohibition of G. L. c. 93A, §§ 2 and 11, against unfair or deceptive conduct. He found the statutory violation to have been wilful, doubled the compensatory damages, and awarded reasonable attorney's fees. Sovereign has appealed. Upon careful review of the record we affirm the determinations of liability under the principle of equitable estoppel and the standards of G. L. c. 93A. We reverse the determination of liability under the implied warranty of good faith and fair dealing. Finally, we remand the case for a reassessment of damages.

*Factual background.* We first summarize the material findings of the trial judge's comprehensive memorandum of decision.

They enjoy the ample support of the evidence.[1] We supplement them with facts established by undisputed portions of the record. We defer certain important details to appropriate points of legal analysis.

1. *The company.* Since 1978 Renovator has been a Massachusetts corporation headquartered in the town of Millers Falls. It manufactures and sells hardware, plumbing, lighting, and other supplies and accessories used in the renovation and remodeling of homes. It manufactures some items at an on-site foundry and machine shop; it purchases others as inventory. It markets its products through retail stores, Internet communication, and large-scale mail order catalog distributions.

Each year at sixty-day intervals, it launches six catalog mailings of approximately one million copies each. The catalogs function as solicitation and general advertising. For mailing purposes Renovator pools the names of its customers with those of similar suppliers around the country designated as trade partners. The partners share a fund of about 6.2 million addresses. Renovator divides each mailing into two parts: the "core" mailing to persons who have purchased from Renovator, or who have requested catalogs, or who have made telephone inquiries about products within the previous three years; and the "noncore" mailing to prospects with a history of purchasing from other suppliers but usually not yet from Renovator. The company views the core list addressees as more likely buyers. Each sixty-day mailing requires substantial phased preparation: the printing of the catalog; the selection of addressees; shipment by private carrier of the addressed books to post office centers; and advance payments to the printer, shippers, and post office.

The timing of the final catalog mailing of the calendar year is especially important. Renovator arranges for delivery of the catalog by December 1 so that it can mature in the hands of the

---

[1]Under Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996), the reviewing court will accept the findings of a bench trial unless they are "clearly erroneous." A finding is clearly erroneous when there is no evidence to support it, or when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977), quoting from *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

recipient during the first two weeks of December. In Renovator's experience, that lead time is important for holiday purchase decisions by customers and prospects. Orders and sales during the first two weeks of December have greatly exceeded those for the second two weeks. To achieve delivery at the beginning of December, Renovator mails the holiday catalog during the first week of November.

Claude and Donna Jeanloz, husband and wife, founded the company in 1978. Claude served as president and Donna as clerk of the corporation. They held eighty-four percent of the stock and actively managed the business. Donna oversaw the financial department; she examined all invoices, determined accounts payable, and signed all checks. For health reasons, the Jeanlozes were downsizing the scale of business operations as of the late 1990's.

2. *The lending relationship.* The company had maintained a revolving line of credit with successive banks since 1980. The credit line furnished an even flow of cash throughout the fluctuations of income and expenditures. Between the cycles of income, the company could meet expenses (payroll, materials, inventory, insurance premiums, and catalog distribution) by checks drawn upon credit. Incoming revenues deposited into the revolving account reduced or eliminated the credit balance. Under the arrangement established with Fleet Bank in 1997 and continued with Sovereign (as Fleet Bank's successor institution) in 2000, Renovator's credit limit was $3,000,000. The Jeanlozes guaranteed the line of credit with their personal assets. The bank treated each draw as a loan; it recovered the loan by daily collections ("sweeps") of all deposits to the account above the level of $10,000. The balance owed on the line of credit ranged typically between $500,000 and $800,000. The Jeanlozes' liquid personal assets approximated $2,000,000.

The company and the lender renewed the line of credit by annual agreement. Typically they had not executed the renewal agreement as of the expiration date. During the interim between that date and the execution of the new agreement, the lender maintained the credit line in the terms of the prior agreement. That practice continued between Fleet Bank and Renovator in 1998 (twelve-day interval) and 1999 (nine days); and between

Renovator and Sovereign in 2000 (twenty-two days) and 2001 (two days).

At Sovereign, several officers dealt with the Renovator account. A financial analyst, Jack Wang, examined the annual reports prepared by the company's certified public accountant and the quarterly reports submitted directly by the company's financial officer. Wang assessed credit worthiness and recommended terms for the annual renewal agreement. An account manager, also known as the relationship manager, had responsibility for supervision of the account and direct communication with Renovator. Finally, a team leader made the final decision upon the terms of the renewal agreement. In the summer of 2002, William Andrseicik, an experienced bank officer, became the relationship manager. Penny Garver, also an experienced officer, moved up from the role of account manager to the position of team leader for the Renovator account.

In the summer of 2001, Garver and Wang met with the Jeanlozes at Renovator's offices as part of the annual renewal process. The Jeanlozes reported that they intended to continue to downsize the volume of business. During the early 1990's, annual revenues had approximated $35,000,000. By 2001, they had reduced to about $10,000,000. The discussion included a description of Renovator's catalog process. The bank officers expressed no concerns about Renovator's credit worthiness. Sovereign renewed the line of credit to July 31, 2002.

3. *The 2002 renewal.* As the July 31 expiration date approached, Renovator's annual financial statement from its certified public accountant was not yet available. By a modification agreement of July 29, the parties extended the expiration date to October 29. Thereafter both parties mistakenly regarded the new deadline as October 31.

During the summer, Andrseicik succeeded Garver as relationship manager of the account. Several factors caused him to regard the line of credit as an increased risk: the general decline of Renovator's gross revenues since the early 1990's; an apparent breach of a covenant of the credit agreement requiring annual profitability of the business; and the lack of security beyond the personal guarantees of the Jeanlozes. He signed the July 29 extension agreement reluctantly.

On October 3, the parties conducted an annual renewal meeting in anticipation of the expiration date at the end of the month. Officers Andrseicik and Wang met with both Jeanlozes and Renovator's chief financial officer at the company offices. Andrseicik asked whether the company would consider provision of some security in addition to the Jeanlozes' personal guarantees. The Jeanlozes rejected the idea. Donna stated that the company would pay off the balance and seek a different lender rather than accept additional collateralization. (She often cited to vendors the unsecured character of Renovator's line of credit as evidence of the company's trustworthiness, and wished to preserve that circumstance.) The bank officers did not pursue the point. They did not mention security or an increased interest rate as conditions of renewal. They did not refer to any concerns about the substance of the annual and quarterly financial reports or about the covenant of profitability. The Jeanlozes requested a reduction of the line of credit limit from $2,500,000 to $1,000,000. At the conclusion of the meeting, Claude asked whether any issues remained for discussion. Wang replied to the effect that it remained only for him to "write it up."

From October 3 through October 31, Sovereign had no further communication with Renovator about the subject of renewal. Within the banking team the renewal process went forward. By the close of October 18, Sovereign had received Renovator's updated quarterly financial statement. On October 18, Wang forwarded to Andrseicik an analytical memorandum of approval of renewal upon the existing terms. He observed that, on the bank's ten-point scale of risk, the line was tending upward from a five toward a six. On October 25, Andrseicik endorsed the approval memorandum, including a provision that Sovereign would waive any profitability covenant violation of the previous year. In addition, the bank modified the face page of the approval memorandum to provide that the risk rating would increase from five to six. An insertion added, "Note that the Account Officer [Andrseicik] will negotiate with the Borrower to secure the credit and raise the pricing (probably by 1%)."

Team leader Garver's approval remained necessary for a final renewal decision. Andrseicik discussed the decision with her on the morning of Friday, November 1. She directed him to urge

the Jeanlozes to accept the added terms of a one percent increase in the borrowing rate and the security interest of an all business asset lien, and to report their response to her. She would then make the final renewal decision.

At about 5:00 P.M., Andrseicik called and informed Claude Jeanloz that Sovereign would renew Renovator's line of credit only upon the additional terms, and that credit was no longer available under the expired agreement. Jeanloz expressed his surprise and rejected the new terms.

4. *Renovator's response.* As of November 1, Renovator had written two large and uncleared checks drawn upon the Sovereign account: one for approximately $80,000 to the post office as the first instalment for the November catalog mailing; and another for more than $20,000 in payment of premiums for employees' health insurance coverage. At about mid-day on Monday, November 4, Donna Jeanloz sent an electronic mail (e-mail) message to Penny Garver:

> "We desperately need to know if you are processing checks for us. The postage check for our holiday mailing has been deposited by the post office but has not cleared. Since catalog mailings are time-sensitive, this would do irreparable harm to our business. Please call Claude . . . to confirm. If we don't hear from you we will assume you are not processing.

> "Please see the attached letter."

The accompanying letter added that the Jeanlozes' personal financial statements substantiated their ability to guarantee the usual balance of the line of credit, and requested that Sovereign extend the recent terms for 120 days or for a shorter reasonable period of time. Donna followed the e-mail with a telephone call to Garver to inquire whether the bank would honor the pending checks. Garver indicated that it would not cover them. Renovator stopped payment on the checks.

Donna then calculated the cash flow needs of the company through the next two to three weeks and adjusted its assets. She converted a corporate securities account to cash in the amount of $114,333. Two other corporate accounts contained $76,743 and

$60,639, respectively. These sources furnished $251,715 of short-term cash. The payments for the November catalog mailings were due at the post office in three instalments, respectively, on October 30, November 4, and November 9.

The cost of mailing the core list catalogs (503,490 copies) came to slightly more than $118,000, and the cost for the non-core list (445,273 copies) to more than $102,000. During the days between November 4 and 8, Renovator decided to mail the core list but not the non-core list. That choice preserved $102,000 for ongoing operating expenses.[2] It also resulted in a substantial shortfall of revenues and profits from the holiday catalog campaign.

Through the first two weeks of November, Sovereign and Renovator communicated about new credit terms. The account meanwhile remained defunct. On November 15, the bank forwarded a proposal. Renovator rejected it as too late for timely mailing of the non-core catalog. In December the Jeanlozes as guarantors paid off the credit balance of the closed account ($783,833) from their personal assets and terminated Renovator's relationship with Sovereign.

This action ensued for recovery of the profits lost by the elimination of the non-core catalog distribution.

*Discussion.*[3] 1. *Equitable estoppel.* In Massachusetts the principle of equitable estoppel functions "to prevent one from benefiting from his own wrongdoing and to avoid injustice." *Harrington* v. *Fall River Hous. Authy.*, 27 Mass. App. Ct. 301, 307 (1989). See *MacKeen* v. *Kasinskas*, 333 Mass. 695, 698 (1956), quoting from *McLearn* v. *Hill*, 276 Mass. 519, 524 (1931) (the purpose of the doctrine is "the prevention of results contrary to good conscience and fair dealing"). The essential elements of equitable estoppel are (1) "[a] representation or *conduct amounting to a representation* intended to induce a course of conduct on the part of the person to whom the representation is made";

---

[2]On the afternoon of November 4, Donna also liquidated $150,000 from a personal securities account and transferred the sum to a corporate checking account as a source of operating funds.

[3]The trial judge ruled that Renovator had not proved its claims of (1) promissory estoppel (requiring an unambiguous promise by the defendant) and (2) misrepresentation. Renovator has not appealed from the resulting judgments in favor of Sovereign upon those theories of liability.

(2) "[a]n act *or omission* resulting from the representation, whether actual or *by conduct*, by the person to whom the representation is made"; and (3) "[d]etriment to [the reliant] person as a consequence of the act or omission" (emphasis supplied). *Turnpike Motors, Inc.* v. *Newbury Group, Inc.*, 413 Mass. 119, 123 (1992), quoting from *Cleaveland* v. *Malden Sav. Bank*, 291 Mass. 295, 297-298 (1935). The complaining party must show that its reliance upon the misleading conduct was reasonable. See *Phipps Prods. Corp.* v. *Massachusetts Bay Transp. Authy.*, 387 Mass. 687, 693 (1982). Typically one party induces another by representations, bargaining, or other conduct to rely upon an apparent commitment to its detriment.[4]

The trial judge correctly concluded that the doctrine estopped the bank from terminating the line of credit without reasonable notice and rendered it liable for damages. The evidence amply supported his finding that "[b]y its comments and particularly by its conduct, the bank led the Jeanloz[e]s to believe that the renewal of the line of credit under the same conditions was assured." For the four previous years the bank had consistently renewed the line and covered all intervals between the expiration date and the execution of the renewal documents. During the critical period of late July to November 1, 2002, it gave Renovator no signal of a coming change in the terms of the account. During the summer of 2002, account manager Andrseicik did not inform the company of his concern about diminishing profits and his reluctance to extend the July 29, 2002, expiration to October 29.

At the meeting of October 3, he inquired about the possibility of additional security. When Donna Jeanloz aggressively rejected the idea and stated her preference to pay off the balance and to

---

[4]See, e.g., *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 376 Mass. 757, 758 (1978) (general contractor relied upon an erroneous price quotation from a subcontractor and incurred resulting financial losses); *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722, 723-727 (1974), *S.C.*, 368 Mass. 811 (1975) (commercial property owner lost alternative sales opportunities, time, and expenses as the result of protracted and misleading inducements by a prospective commercial purchaser of his property); *Hickey* v. *Green*, 14 Mass. App. Ct. 671, 672 (1982) (plaintiffs sold their home in reliance upon a promise by the defendant); *Greenstein* v. *Flatley*, 19 Mass. App. Ct. 351, 354-357 (1985) (commercial tenant lost time, alternate rental opportunities, and expenditures as the result of false inducements by a prospective commercial landlord).

take the account elsewhere, he did not pursue the subject. He did not express his view that the account required a higher interest rate; nor did he express his concern about declining profits. He did not contradict Jack Wang's closing comment that Wang would "write it up."

Even though the meeting had strengthened his conviction of the need for an increased interest rate and additional collateral, Andrseicik did not communicate with Renovator throughout the remainder of October. During that period he received Wang's analytical approval memorandum on October 18 and endorsed it on October 25 with the provision that he would negotiate for a higher interest rate and added security. Despite his role as account manager since July, he did not inform Renovator of his concerns and of the resulting new conditions of credit until the close of business on November 1, three days after the expiration of the old line of credit. He was aware throughout this period that the line of credit served as the primary operating account of the company.[5]

This prolonged silence inflicted a serious opportunity cost upon Renovator. The Jeanlozes testified that notice of the new terms on October 3 would have enabled the company to finance the entire upcoming catalog distribution either by a slightly earlier mailing ahead of the October 29 expiration date, or by proceeds from the prompt sale of available scrap materials, or by application for credit from other banks. The evidence justified the judge's conclusion. "On November 1, 2002, having encouraged [Renovator] to believe that the present line of credit was acceptable, the bank's options were to either agree to the present line of credit or give Renovator[] a reasonable period of time to seek an alternative source of financing. The bank did neither."[6]

2. *Violation of G. L. c. 93A.* a. *Liability.* The evidence sup-

---

[5]Andrseicik testified that he did not inform the Jeanlozes of his views because he believed that Wang and Garver wished to preserve the account, because he thought that Wang would communicate with them, and because he doubted his authority to impose new terms without Garver's approval. The trial judge did not accept this explanation as credible.

[6]Sovereign argues that equitable estoppel requires proof that the wrongdoer intentionally benefited from its inducement of the reliant party and that the bank here achieved no such ultimate advantage. The evidence permitted the judge to find that the account manager's prolonged nondisclosure employed the credit renewal deadline in an attempt to coerce Renovator's acceptance of

ported also the judge's conclusion that Sovereign had acted in an unfair or deceptive manner in violation of G. L. c. 93A, §§ 2 and 11. In particular he observed that on November 1 the bank had presented Renovator with a "take it or leave it" proposal on the assumption that the Jeanlozes would "come around." In the judge's words, "The bank wanted new terms and now had the leverage to achieve the new terms."

The statutory criteria for unfair conduct are whether it lies "within at least the penumbra of some common-law, statutory, or other established concept of unfairness; . . . whether it is immoral, unethical, oppressive, or unscrupulous; [and] . . . whether it causes substantial injury to consumers[,] competitors[,] or other business [entities]." *PMP Assocs.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975). Unfairness acquires its character from the circumstances of each case. See, e.g., *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 27, cert. denied, 522 U.S. 1015 (1997); *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979), *S.C.*, 12 Mass. App. Ct. 990 (1981); *Doliner* v. *Brown*, 21 Mass. App. Ct. 692, 698 (1986) ("The situations have to be sized up one by one"). The statute works from its own bottom. Actionable unfairness does not require an established common-law wrong or breach of equitable standards. See *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975); *Calimlim* v. *Foreign Car Center, Inc.*, 392 Mass. 228, 235-236 (1984); *Linkage Corp.* v. *Trustees of Boston Univ., supra* at 27-28.[7] Conversely, the presence of a common-law wrong does not automatically amount to an unfair

terms more favorable to the bank. The failure of the attempt does not excuse it. The doctrine does not require a benefit for the perpetrator (although it often achieves one), but rather reliant harm to the victim of the inequitable inducement. See the cases collected in note 4, *supra*.

Our case does not fall into the zone of imperfect or unfinished negotiations exemplified by the facts of *Tull* v. *Mister Donut Dev. Corp.*, 7 Mass. App. Ct. 626, 630-632 (1979) (continuing give and take over the terms of an unresolved commercial lease agreement). Here no negotiations or dialogue over terms developed between July and the end of October, 2002. The prolonged silence of Sovereign prevented any knowledge by Renovator of the need for negotiation until the telephone call notice three days after expiration.

[7]See also *Greenstein* v. *Flatley*, 19 Mass. App. Ct. at 356; *Bump* v. *Robbins*, 24 Mass. App. Ct. 296, 305-312 (1987); *Zayre Corp.* v. *Computer Sys. of Am., Inc.*, 24 Mass. App. Ct. 559, 570-571 (1987).

act within the meaning of the statute. *Mechanics Natl. Bank of Worcester* v. *Killeen*, 377 Mass. 100, 109 (1979).[8]

One of the more specific categories of unfairness developed by the case law consists of coercive or extortionate tactics designed to extract undeserved concessions from other business entities or consumers. See, e.g., *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 472-476 (1991) (landowner's pretextual disapproval of a development plan attempted to squeeze additional compensation out of the developer); *Massachusetts Employers Ins. Exch.* v. *Propac-Mass, Inc.*, 420 Mass. 39, 43 (1995) (a contract breach employed to disrupt another party's remaining rights has the coercive character of a c. 93A violation); *Frank J. Linhares Co.* v. *Reliance Ins. Co.*, 4 Mass. App. Ct. 617, 622-623 (1976) (holding a truck hostage in exchange for the owner's waiver of warranty rights); *Community Builders, Inc.* v. *Indian Motocycle Assocs.*, 44 Mass. App. Ct. 537, 557-559 (1998) (nonpayment of contractual debt to pressure an opponent for a compromise of its claim); *Arthur D. Little, Inc.* v. *Dooyang Corp.*, 147 F.3d 47, 52 (1st Cir. 1998) (withholding validly owed payments as bargaining leverage).[9] The coercive effort need not succeed. As the facts of *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, *supra* at 462, illustrate, the party targeted for pressure may resist, absorb its losses, and pursue its remedies under the statute.

The evidence supported the judge's finding that Sovereign had lulled Renovator to a point beyond its credit deadline and had exploited that timing in an attempt to force the unwanted additional credit terms upon the company. He attributed that conduct primarily to the account manager. Andrseicik did not offer a satisfactory explanation for the period of unbroken silence up to

---

[8]See, e.g., *Whitinsville Plaza, Inc.* v. *Kotseas*, 378 Mass. 85, 100-101 (1979) (allegation that the defendants breached a contract and committed "unfair acts and practices," without more, insufficient to withstand a motion to dismiss a c. 93A claim); *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. at 504 (refusal to pay a disputed bill did not comprise a c. 93A violation). See also *Poly* v. *Moylan*, 423 Mass. 141, 149, 151 (1996), cert. denied, 519 U.S. 1114 (1997) (negligent misrepresentation or deceit may fall short of c. 93A wrongdoing).

[9]See also *Atkinson* v. *Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992), and *Kobayashi* v. *Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 505 (1997), for discussion of the same point in dicta.

November 1, especially since his views about renewal terms had formed as early as July and had solidified at the meeting of October 3. Andrseicik's views remained unchanged through the arrival of the company's updated financial reports, Wang's delivery of the approval memorandum on October 18, and his own endorsements of the new terms on October 25. In particular, the approval memorandum explicitly waived any violation of the profitability covenant. However, in the telephone call to Claude Jeanloz at the close of November 1, Andrseicik did not report the waiver but rather invoked the violation of the covenant as a ground for the stiffer renewal terms. That circumstance especially bolsters the judge's finding of a strategy of unjustified delay and coercive pressure. Finally, Donna Jeanloz's e-mail of November 4 indicated the effectiveness of the bank's action. Renovator "desperately" needed to know whether it retained a line of credit for the "time-sensitive" mailings of the holiday catalog.

b. *Wilfulness.* The judge found further that the unfairness of the bank's renewal conduct was "willful and deliberate" within the meaning of G. L. c. 93A, § 11, so as to entitle Renovator to double the compensatory damages resulting from the cancellation of the non-core catalog. The accumulated evidence substantiating the findings of estoppel and unfairness supports also the inference of knowing and wilful behavior. The judge focused upon the conduct of the account manager and especially the "disingenuous" November 1 explanation to Claude Jeanloz that Renovator was violating the profitability covenant.

In addition, Andrseicik testified at length. The judge had ample opportunity to assess his testimony and demeanor. In the absence of a jury the judge often exercised his discretion to put his own questions to the witnesses. Determinations of credibility and motivation belong to the first-hand observation of the trial judge. They receive special deference from the reviewing court equipped with only the cold record of testimony. See generally *Andover Hous. Authy.* v. *Shkolnik*, 443 Mass. 300, 306 (2005). See also *Rex Lumber Co.* v. *Acton Block Co.*, 29 Mass. App. Ct. 510, 518-520 (1990) (reviewing court deferred to the trial judge's finding of the defendant's "deliberately" late notice of repudiation of an oral agreement in violation of G. L. c. 93A); *Kitner* v. *CTW Transport, Inc.*, 53 Mass. App. Ct. 741,

747-748 (2002) (the evidence permitted the trial judge's finding of deceptive conduct in violation of G. L. c. 93A by reason of the defendant's termination of a contract with the plaintiff without notice and upon a pretext).[10]

In sum, the judge's determinations of unfairness and wilfulness under G. L. c. 93A, §§ 2 and 11, were justified. They support the entitlement of Renovator to compensatory damages, to the doubling of damages, and to an award of reasonable attorney's fees and costs.[11,12]

---

[10]Several passages in Andrseicik's testimony, in combination with the timing of the November 1 telephone call, support the finding of opportunistic or coercive motivation.

> *Q.* [By Renovator's counsel]: "By signing off [on the approval memorandum on October 25], you were saying 'I'm not going to make [a] higher interest rate or collateral a condition of renewal, but I am going to try to seek to negotiate it' "?
>
> *A.:* "Yes."
>
> ". . ."
>
> *Q.:* "What did you think would happen [if the bank insisted on additional collateral for renewal]?"
>
> *A.:* "[M]y feeling was that they would think about it for a second, realize that the incremental cost was negligible; that this was a deal in hand that would extend for another year their line of credit and their access to their line of credit. So my thinking was that they would have been unhappy with it initially, but they would have come to realize it made economic sense."

[11]Upon the basis of posttrial submissions (motion, verified itemization, and opposition) the judge awarded Renovator substantial fees and costs. On appeal Sovereign has contested c. 93A liability and therefore the entitlement to the award, but not its amount. Our decision therefore affirms both the entitlement and the amount.

[12]In the case of *Lambert* v. *Fleet Natl. Bank*, 449 Mass. 119, 126-127 (2007), the court held that the defendant bank's termination of a credit relationship did not constitute unfair conduct within the meaning of G. L. c. 93A. The plaintiff claimed that the bank's nonrenewal of his promissory note and mortgage covering multiple rental units had occurred with prejudicial suddenness. The facts of that case are distinguishable. The debtor had accumulated a history of delinquent payments; the bank hedged against assurance of a mortgage renewal. The evidence indicated that the bank may have provided notice of nonrenewal two to three months before deadline. However, the court did not treat that circumstance as a material fact. *Id.* at 122 & n.6.

3. *Breach of the implied covenant of good faith and fair dealing.* The judge concluded also that Sovereign's termination of the line of credit "suddenly and without warning" after the parties' history of liberal extensions violated the implied covenant of good faith and fair dealing. His reasoning implied a covenant of adequate notice of termination. No provision for notice of nonrenewal appears in any of the contractual documents creating the line of credit.

The implied covenant provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. at 471-472, quoting from *Drucker* v. *Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976). See 23 Williston, Contracts § 63:22 (4th ed. 2002). It governs the performance of contracts but not their formation. See *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004); *Sheehy* v. *Lipton Indus., Inc.*, 24 Mass. App. Ct. 188, 194 n.6 (1987). It does not create rights and duties which the parties did not negotiate and include in their agreement. See *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, *supra* at 385; *Chokel* v. *Genzyme Corp.*, 449 Mass. 272, 276 (2007); *Eigerman* v. *Putnam Invs., Inc.*, 450 Mass. 281, 288 (2007).

The difference between the implication of a duty of good faith and fairness in the performance of existing terms and the creation of new terms may present close questions. The primary source of guidance is the text of the contractual documents. Courts may widen the examination to include a course of performance or course of dealing between the parties. See 23 Williston, Contracts § 63:22, *supra.* We apply that criterion cautiously to the occasion of a negotiated renewal of a significant contract with variable terms. Here no provision for notice of nonrenewal appears in the account papers. The distinction between formation and performance is intelligible and fair. It limits the duties of the parties to the expressed and accomplished terms of their agreement. It leaves available off-the-contract rights and remedies such as the estoppel and c. 93A standards invoked in this instance. Here Sovereign's actionable conduct related entirely to the formation of a further credit agreement and not to the

performance of the existing agreement. Accordingly, we reverse the judgment against the bank upon this claim.

4. *Causation.* Sovereign contends that, for two independent reasons, its action, whether characterized under the standards of equitable estoppel or G. L. c. 93A, did not cause the losses resulting from the elimination of the non-core mailing. First, the cancellation of the mailing did not result from the nonrenewal of the credit line, but rather from the intervening business decision of the company. Second, the losses lay beyond the reasonably foreseeable consequences of the nonrenewal.

As of November 8, Renovator had available $251,712 in cash. The cost of the non-core mailing would be $102,492. The judge concluded that the preservation of the second sum for ongoing operating expenses was a reasonably prudent business decision. Sovereign contends that the decision unreasonably surrendered the additional mailing and unnecessarily generated any lost profits.

The case of *Makino U.S.A., Inc.* v. *Metlife Capital Credit Corp.,* 25 Mass. App. Ct. 302, 319 (1988), provides a standard for reasonable behavior in these circumstances: "A person whose wrong forces a choice between reasonable but potentially hazardous courses cannot be heard to complain about the wronged party's selection. That selection enjoys wide latitude and is to be respected so long as it is not irrational. McCormick, Damages 133-136 (1935)." The test is not whether, in hindsight, the injured party made the optimum response to the threatened harm; but rather whether, in foresight, it made a rational response.

For several reasons Renovator acted rationally. If the company had expended another $102,000 upon the second mailing, it would have reduced its available operating funds to about $150,000. The history of its line of credit indicated that during revenue troughs it carried a balance of $775,000. In addition, the termination of the Sovereign line of credit made the Jean-lozes, as guarantors, immediately responsible for payment of the final balance of that estimated magnitude, an obligation weighing heavily in Donna's calculation. The termination of the account caused the stoppage of the pending October 29 checks of $80,000 and over $20,000 to the post office and the employees' health insurer which the company had to cover im-

mediately with corporate money or personal funds of the Jeanlozes. The nonrenewal forced the Jeanlozes' reaction onto an exigent timetable. They had only the days from November 4 to November 8 for their decision. They decided reasonably to conserve cash for ongoing operations.

The disruption of the holiday catalog mailings was reasonably foreseeable to Sovereign. Most generally, the bank's internal "Credit Policy Manual" instructed account managers to identify events of noncompliance and to notify the borrower of such events promptly by writing. The lack of any such warning about an alleged breach of the profitability covenant deviated from the bank's own policy and made the surprise and injury to Renovator's flow of business predictable. More specifically, Donna Jeanloz provided a thorough explanation of the company's catalog cycle system to bank officers Garver and Wang during the annual account renewal meeting of 2001. Donna Jeanloz's e-mail and accompanying letter to Garver on November 4 specifically notified Sovereign of the immediate impact upon the holiday catalog distribution at a time when the bank could still have furnished a short extension and saved the mailing. The bank's hard-line tactics exposed it to liability for the reasonably foreseeable category of lost profits caused by the abrupt termination. See *Cherick Distribs., Inc.* v. *Polar Corp.*, 41 Mass. App. Ct. 125, 128-129 (1996) (termination of a beverage distributorship on four days' notice warranted liability for the injured party's eventual lost profits). Finally, from annual and updated quarterly financial statements, and from Wang's analytical approval memorandum of October, 2002, Sovereign had detailed knowledge of the company's cash flow and its reliance upon the catalog schedule for its revenue pace. The bank could reasonably assess the impact of a lost or disrupted catalog cycle.

5. *The measure of damages.* As compensatory damages, the judge awarded Renovator the estimated loss of profits resulting from the cancellation of the non-core catalog. His methodology was (1) to compute an average amount of revenue received per catalog (the so-called "buy rate"); (2) to multiply that figure by the 445,273 unmailed non-core catalogs; and then (3) to subtract from that product the sum of (a) the estimated cost to Renovator of the goods which would have sold through the unmailed

catalog, and (b) the cost of the postage which would have accompanied the mailing.

The judge extrapolated the first figure, the estimated revenue per non-core catalog, by calculation of an average revenue per catalog (undifferentiated core and non-core) for the eleven mailings conducted within one year (before and after) of the November, 2002, partial distribution. After exclusion of the high and low figures, the resulting revenue was $0.987 per catalog. Thus the estimated gross revenue lost for the 445,273 November non-core catalogs amounted to $439,484. The cost of goods sold approximated eighteen percent of gross revenue, or $79,107; and the cost of mailing saved by Renovator was $102,492. The gross revenue of $439,484 minus the total costs of $181,599 yielded a net lost profit of $257,885.[13]

The formula for the measure of damages is a question of law subject to de novo review on appeal. *Twin Fires Inv., LLC* v. *Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 424 (2005). Reasonable approximation is permissible, especially in circumstances of indefiniteness caused by the conduct of the wrongdoer. See *Air Technology Corp.* v. *General Elec. Co.*, 347 Mass. 613, 627 (1964); *Zimmerman* v. *Bogoff*, 402 Mass. 650, 662 (1988). The precedents recognize lost profits as a measure of damages typically difficult for calculation and usually acceptable as an approximation. "The plaintiff [is] not required to prove its lost profits with mathematical precision. Under our cases, an element of uncertainty is permitted in calculating damages and an award of damages can stand on less than substantial evidence. This is particularly the case in business torts, where the critical focus is on the wrongfulness of the defendant's conduct." *Herbert A. Sullivan, Inc.* v. *Utica Mut. Ins. Co.*, 439 Mass. 387, 413 (2003), quoting from *Ricky Smith Pontiac, Inc.* v. *Subaru of New England, Inc.*, 14 Mass. App. Ct. 396, 426 (1982). The standard of reasonable approximation has its limits; it cannot descend into speculation. See *Snelling & Snelling of Mass., Inc.* v. *Wall*, 345 Mass. 634, 636 (1963); *Squeri* v. *McCarrick*, 32 Mass. App. Ct. 203, 209 (1992).

---

[13]The judge rejected as unsubstantiated Renovator's proposal of higher figures: per catalog revenue of $1.59; total lost revenue of $707,984; and net lost profits of $481,595.

Despite the accommodation of the inherent uncertainty of estimated lost profit damages, we believe that the formula here does contain an element of unreliability. As Sovereign points out, the calculation assigns a buy rate to the November catalogs without regard to the distinctive characters of the core and non-core mailing lists. The evidence does not support the assumption of their equal drawing power. Claude Jeanloz acknowledged that, historically, eighty to eighty-seven percent of the non-core list consisted of addresses for customers who had purchased from other suppliers but not from Renovator. The company distinguished generally between the qualities of the lists by their very separation, and distinguished specifically between them by its mailing decision under the pressure of events during the first week of November.

A reasonable approximation must take into account the difference between the lists. On remand, the judge should do so. He will be free to apply alternate methods to the existing evidence, and to take such additional evidence as he might deem useful.[14]

6. *Appellate fees and costs.* As Renovator proposes at the conclusion of its brief, its successful maintenance of the c. 93A judgment entitles it to an award of reasonable appellate fees and costs. See *Linthicum* v. *Archambault*, 379 Mass. 381, 389 (1979); *Twin Fires Inv., LLC* v. *Morgan Stanley Dean Witter & Co.*, 445 Mass. at 433. Renovator should make and substantiate its claim, and Sovereign should submit any opposition, in accordance with the process prescribed in *Fabre* v. *Walton*, 441 Mass. 9, 10-11 (2004).

*Conclusion.* We affirm so much of the judgment as held Sovereign liable on the claims of equitable estoppel and violation of G. L. c. 93A, §§ 2 and 11, including the award of the specific amount of attorney's fees and the entitlement to double the amount of compensatory damages as authorized by § 11 for wilful misconduct. We reverse so much of the judgment as held Sovereign liable on the claim for breach of the implied covenant

---

[14]In its brief, Sovereign has proposed one method differentiating between the lists and resulting in a greatly reduced damages figure. Other methods are reasonably available. We do not endorse any specific formula, but rather leave the new computation to the sound discretion of the trial judge.

of good faith and fair dealing. We vacate the amount of the award of damages and remand the matter to the Superior Court for redetermination of damages consistent with this opinion.

*So ordered.*