Advanced Patient Care, LLC (APC), brought this action against Partners HealthCare System, Inc. (Partners), after a business relationship between them failed. Among other claims, APC asserted breach of contract, breach of the implied covenant of good faith and fair dealing, defamation, commercial disparagement, and violation of G. L. c. 93A. A judge allowed Partners's motion for summary judgment on each of these claims, and APC appeals.[2] As Partners agrees, there are disputed issues regarding a portion of APC's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. We therefore vacate a portion of the judgment and remand for further proceedings on those issues only. In all other respects, we affirm.
Background. The following facts are undisputed. APC is a company that produces wound care products known by the name of GentleOne. Partners is a hospital and physician network, which includes Brigham and Women's Hospital (BWH) and Massachusetts General Hospital (MGH). In 2009 APC marketed GentleOne products to BWH. After a surgeon evaluated the samples, Dave Dolan, then a nursing director at BWH, sought authorization from Partners to purchase the products.
Thereafter, APC participated in an eleven-step process to obtain Partners's approval for use of GentleOne at BWH. Upon completion of the process, APC and Partners entered into a "materials agreement" in October of 2010. The materials agreement, which had a term of one year, states that "APC will provide to Partners the materials described in Exhibit A hereto ... (the 'Deliverables')." It further states that "[a]ll purchases of Deliverables must be approved in writing, in advance, by Partners." Although exhibit A sets out product descriptions and unit pricing for the "Deliverables," the materials agreement nowhere specifies the quantities of product to be bought or sold.
Following execution of the materials agreement, Dolan and APC sales representative Mark Cyr discussed the projected use of GentleOne at BWH. In an electronic mail message (e-mail) dated November 21, 2010, Cyr wrote that he and Dolan had determined the projected use to be thirty-two boxes of the "starter dressings" per month, or 192 boxes over six months, and sixty-four boxes of the "cover dressings" per month, or 384 boxes over six months. Partners forwarded these projections to distributor Owens & Minor (O&M), which Partners used as an intermediary to place its orders for GentleOne.
In January of 2011, Cornel Ramos, a product manager at Partners, instructed O&M to purchase a two-month supply of GentleOne. O&M, however, ordered cases instead of boxes, resulting in an order that was ten times larger than what Partners expected. Nonetheless, APC delivered the order to O&M in April of 2011, and O&M paid for it in full.
Subsequently, O&M and APC discussed how to handle the surplus inventory. In August of 2011, APC agreed to the return of 150 boxes, and O&M agreed to continue to stock GentleOne, subject to APC paying a stocking fee and committing to sell fifty percent of its inventory by the end of 2011. When APC failed to meet that goal, it agreed to take back more inventory, for a total of 1,048 boxes. APC did not refund O&M for the returned boxes.[3]
Meanwhile, in September of 2011, Dolan left BWH and later joined APC as a sales representative. In January of 2012 (after the materials agreement had expired), his replacement, Eileen O'Connell, told Cyr that BWH had decided to discontinue using GentleOne.[4] According to Cyr, at this meeting, O'Connell falsely referred to a "recall" of the product. The same month, APC tried to sell GentleOne to clinicians at MGH. Dolan set up a meeting with MGH nurse manager Annette Levitt, but Levitt canceled, stating that she had "been advised by Partners ... that there is currently a recall on some of the products."[5]
In December of 2012, APC served a demand letter on Partners alleging, among other things, breach of contract and violations of G. L. c. 93A. The parties engaged in discussions throughout early 2013, but Partners ultimately decided not to reinstate APC as a vendor.[6]
Discussion. We review the judge's decision de novo, taking the evidence in the light most favorable to APC. See Boazova v. Safety Ins. Co., 462 Mass. 346, 350 (2012). Summary judgment is appropriate if Partners can prove that APC "has no reasonable expectation of proving an essential element of its case." Ibid.
1. Breach of contract (count 1). As APC clarified at oral argument, its claim of breach of contract rests on two grounds: (1) Partners's failure to pay for the three orders totaling $35,160, see note 2, supra; and (2) its refusal to continue to buy GentleOne products. Regarding the first ground, Partners conceded at oral argument that there are disputed issues as to whether the $35,160 is owed to APC and, if so, whether it is O&M or Partners that is liable for it. Further proceedings are thus required on that portion of APC's claim.
Regarding the second ground, however, APC can point to no contract that required Partners to buy more product than it did, whether before or after the materials agreement expired. It is undisputed that the materials agreement did not specify a quantity of GentleOne to be bought or sold, but instead contemplated that purchases would be governed by future "writing[s]" (i.e., purchase orders), which had to be "approved ... in advance, by Partners." Thus, while the materials agreement may have been enforceable with respect to the topics it covered, such as pricing, it imposed no obligation on Partners to purchase any particular quantity of product, or any product at all for that matter. See Gill v. Richmond Co-op. Assn., Inc., 309 Mass. 73, 80 (1941) (no enforceable contract where buyers "promised nothing except to buy such milk as they might order"); Cabot Corp. v. AVX Corp., 448 Mass. 629, 640 (2007) ("[A] 'contract' to purchase an unspecified amount of goods is not a contract at all").[7]
We disagree with APC's contention that the parties' e-mails demonstrate that Partners committed itself to purchase "at least as much as [Partners's] projected usage" of GentleOne. One e-mail sets forth APC's unilateral "expectation" of the amount of product it could produce per month, and the remainder merely provide projections of Partners's usage for the ensuing six-month period. Nowhere did Partners promise to buy at least as much as the projections or otherwise commit itself to buy any specified quantity of product.[8] Cf. Cabot Corp., 448 Mass. at 640 (language in letters that " '[i]t [was buyer's] intention to purchase the following materials' [was] not a binding commitment by [the buyer] to make any purchases at all"). Thus, as no contractual provision required Partners to order more product than it did, there is no triable issue on this aspect of APC's claim.
2. Breach of implied covenant of good faith and fair dealing (count 2). The implied covenant of good faith and fair dealing prevents a party to a contract from "do[ing] anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-472 (1991). "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship." Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004). APC's failure to demonstrate a contractual breach therefore dooms its claim of breach of the covenant (other than the portion relating to the $35,160 in unpaid orders).
Arguing otherwise, APC appears to suggest that the covenant imposed an independent obligation on Partners to renew the materials agreement and to continue using APC as a vendor. That is not so. The covenant governs "the performance of existing [contractual] terms," but not "the creation of new terms." Renovator's Supply, Inc. v. Sovereign Bank, 72 Mass. App. Ct. 419, 433 (2008). The materials agreement contains no provision that speaks to renewal. Thus, regardless of its reasons, Partners did not breach the covenant by declining to renew and by terminating APC as a vendor. See id. at 433-434 (defendant did not breach covenant where "actionable conduct related entirely to the formation of a further ... agreement and not to the performance of the existing agreement").
Partners was therefore entitled to summary judgment on this claim, excepting the portion concerning the unpaid $35,160, as to which disputed issues remain.
3. Defamation and commercial disparagement (counts 4 and 5). To prove defamation or commercial disparagement, APC must show that Partners published a false statement about APC to a third party. See White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66 (2004) (defamation); HipSaver, Inc. v. Kiel, 464 Mass. 517, 523 (2013) (commercial disparagement). APC bases its claims on four alleged uses of the word "recall" by (1) BWH employee O'Connell at a meeting, (2) MGH employee Levitt in an e-mail to APC, (3) O&M in two "debit memos" sent to APC, and (4) Partners employee Ramos to Levitt. Even assuming, however, that the first three statements can be imputed to Partners, they plainly were not communicated to a third party. O'Connell's alleged statement was made only to representatives of APC, Partners, and BWH.[9] Levitt's and O&M's statements were made only to APC itself. Thus, with respect to these statements, APC cannot prove the publication element of its claims.
Regarding Ramos's alleged statement to Levitt,[10] we agree with the judge that the statement falls within the "common business interest" privilege. This conditional privilege applies "if the publisher of the statement and the recipient have a common interest in the subject and the statement is 'reasonably calculated to further or protect that interest.' " Downey v. Chutehall Constr. Co., 86 Mass. App. Ct. 660, 666 (2014), quoting from Sheehan v. Tobin, 326 Mass. 185, 190-191 (1950). Our "courts have consistently recognized the common interest privilege within the business context." Ibid. (collecting cases).
APC does not contest that Partners and MGH had a legitimate and common business interest in evaluating whether MGH should use GentleOne products, and that Ramos's statement furthered their common interest. Cf. Humphrey v. National Semiconductor Corp., 18 Mass. App. Ct. 132, 133-134 (1984) ; Downey, 86 Mass. App. Ct. at 666. APC argues, however, that the conditional privilege was lost because Ramos made the statement with reckless disregard for its falsity. See Downey, supra at 667 (to defeat conditional privilege, plaintiff must prove that defendant's conduct was reckless). But in support, APC asserts only that Ramos failed to exercise "diligence," which, even if true, does not constitute recklessness. See ibid., quoting from HipSaver, Inc., 464 Mass. at 530 ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing"). Furthermore, the undisputed facts are that, upon learning that Levitt believed GentleOne to be recalled, Ramos quickly followed up to make "clear that the product is not on a Recall." In light of this evidence, APC has no reasonable expectation of proving that Ramos acted recklessly.
4. Violation of G. L. c. 93A (count 6). Finally, APC contends that Partners's conduct was unfair and deceptive under G. L. c. 93A. Because both APC and Partners are engaged in trade or commerce, "a good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made." Duclersaint v. Federal Mort. Assn., 427 Mass. 809, 814 (1998). It is evident that APC and Partners had "a genuine difference of opinion," ibid., i.e., "an ordinary ... dispute without conduct that was unethical, immoral, oppressive, or unscrupulous." Ibid., quoting from Kobayashi v. Orion Ventures, Inc., 42 Mass. App. Ct. 492, 505 (1997). We therefore agree with the judge that APC has failed to identify any misconduct that rises to the level of a c. 93A violation.
Conclusion. So much of the judgment as dismisses counts 1 and 2, as they relate to the $35,160 in unpaid orders, is vacated, and the matter is remanded for further proceedings consistent with this memorandum and order. In all other respects, the judgment is affirmed.
So ordered.
Vacated in part, affirmed in part.

Another claim, for negligence, was dismissed earlier in the proceeding. APC does not appeal from that dismissal.

According to APC, it owed no refund because Partners caused the ordering error and failed to pay for three subsequent orders totaling $35,160. APC alleges that these orders were placed on June 22, 2011; September 28, 2011; and October 5, 2011.

The parties dispute the reasons for BWH's decision, but the dispute is immaterial to our analysis.

A few days later, Ramos e-mailed Levitt, stating that he "hope[d] to be clear that the product is not on a Recall. It is just that it does not adhere and absorb as the rep has claimed."

The parties dispute the reasons for Partners's decision, but this dispute is also immaterial to our analysis.

The judge correctly determined that Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 68 Mass. App. Ct. 582 (2007), does not help APC's cause. That case involved a requirements contract, i.e., a contract that "measures the quantity [of goods to be sold] by ... the requirements of the buyer." Id. at 597, quoting from G. L. c. 106, § 2-306(1). Cf. Gill, 309 Mass. at 80 (buyers' promise "to buy such milk as they might order ... was not like a promise to buy such milk as they might need in their business"). The materials agreement is not a requirements contract, nor is it an output contract, which measures quantity according to "the output of the seller." Brewster Wallcovering Co., 68 Mass. App. Ct. at 597. To the contrary, it specifically provides that "[n]othing ... shall limit APC's right to provide Deliverables to any other entity, nor [sic ] Partners' right to procure any material(s) from any other entity."

In any event, as the judge noted, the ordering error resulted in Partners buying far in excess of the projections.

As APC acknowledged at oral argument, to impute O'Connell's statement to Partners, BWH and Partners must be treated as the same entity.

We will assume that Ramos's statement can be ascribed to Partners and that Levitt qualifies as a third party.