NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1006

CHARLES W. LONG, trustee,[1] & another[2]

vs.

COMMONWEALTH OF MASSACHUSETTS & another.[3]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

This case involves whether the Commonwealth holds title to a strip of land on which lies a portion of the Cape Cod Rail Trail (the rail trail), a multiuse recreational trail maintained by the Commonwealth through its Department of Conservation and Recreation; and, if it does, whether the owner of the land on either side of the strip has an easement by necessity across it. After trial, a judge of the Land Court concluded that the Commonwealth does hold title to the strip and that the owner of the land on either side does not have an easement by necessity. We affirm.

---

[1] Under the will Bernice A. Wiley.
[2] Henry G. Long, trustee under the will of Bernice A. Wiley.
[3] Department of Conservation and Recreation.

Background.  Appellants Charles W. Long and Henry G. Long (the trustees) are cotrustees under the will of Bernice A. Wiley.  This appeal concerns land Bernice Wiley owned at her death that was owned before 1870 by Stephen A. Hatch.  The land is shown as Lots 1 and 2 on Land Court Plan 32364A.  Those lots are bisected by a strip of land 82.5 feet wide (the strip) that, from the 1870s to the mid-1960s, was used by the Cape Cod Railroad Company (the railroad company) and its successors.  Lot 1 is west of the strip and is bounded on the west by Route 6.  Lot 2 is to the east of the strip.  In January 1981, the Penn Central Railroad Company conveyed its interest in the entire former rail line, including its interest in the strip, to the Commonwealth.  Today, located within the strip is a segment of the rail trail.

It is undisputed that at one time, Hatch owned a parcel of land that encompassed, inter alia, Lots 1 and 2 and the strip that now bisects them.  On May 6, 1870, Hatch executed an agreement with the railroad company stating that if it constructed a railroad somewhere on the Hatch property, he would execute a deed to the railroad company for that portion of the land.  The railroad company constructed a section of railroad on the strip, which began operation in December 1870.  On May 17, 1871, Hatch executed a deed purporting to convey the strip to

2

the railroad company. The 1871 railroad deed was recorded in March 1872. Hatch died intestate in 1873.

In 1874, "Sarah P. Higgins [daughter of Hatch] and Allen Higgins husband of Sarah and joining in this conveyance" executed a deed conveying several parcels of the Hatch property to John Wiley (Wiley), the predecessor in interest to Bernice Wiley and, now, the trustees. The deed identified the land to the west and to the east of the strip as two separate parcels, described in the deed as bounded by "the Railroad track" and by "the line of the Railroad," respectively. This 1874 Higgins-Wiley deed said, at the end of all the descriptions, "Meaning and intending to convey all Real Estate owned by the late Stephen Hatch, except the Woodland not herein described."

The trustees filed this case in March 2016, seeking a declaration that an easement by necessity existed to cross the strip -- and thus the rail trail -- to reach Lot 2 from Lot 1.[4] That claim was (and is) based on the 1871 deed from Hatch to the railroad company conveying the strip. The trustees argued that, when Lot 2 was part of a single parcel owned by Hatch, it had immediate access to Route 6, then known as the Old County Road. But, they alleged that when the strip was conveyed, that direct access across Hatch's land was no longer available.

_____

[4] They sought in the alternative to quiet title to the strip.

3

During discovery, the parties, remarkably, became aware of a previously unknown March 16, 1870 deed (the Hatch-Higgins deed) from Hatch to his son-in-law Allen Higgins (Higgins), by which Hatch conveyed to Higgins a parcel of land that included the strip. This was a year before Hatch, by the 1871 railroad deed, purported to convey that same strip to the railroad company. The Hatch-Higgins deed was recorded two days after it was executed. It did not purport to convey anything to Hatch's daughter, Higgins's wife, Sarah Higgins. Except for the strip, the 1874 Higgins-Wiley deed included all land purportedly conveyed to Higgins in the 1870 Hatch-Higgins deed, as well as other land that was not included in that deed.

The trustees now argue, based on the 1870 Hatch-Higgins deed, that the strip was never conveyed to the railroad company. They argue that, despite the metes and bounds descriptions in the 1874 Higgins-Wiley deed, by language stating that the descriptions in the deed "[m]ean[t] and intend[ed] to convey all Real Estate owned by the late Stephen Hatch, except the Woodland not herein described," it also conveyed the strip to Wiley.

After trial, a judge of the Land Court concluded,

"it is clear that either (1) Hatch intended to hold back the disputed strip from the 1870 Hatch-Higgins deed so he could later convey it through the 1871 Railroad Deed, and mistakenly failed to do so, or (2) Higgins indeed was intended to take title to the disputed strip in 1870, and Hatch, by executing the 1871 Railroad Deed was effectuating

4

as Higgins' agent the clear intent and expectation of Higgins that it be so conveyed."

The judge went on to state that if it was the first, reformation of the 1870 Hatch-Higgins deed would be warranted, and if the second, the trustees would be estopped from challenging the 1871 railroad deed. In either event, the judge concluded that the 1871 railroad deed was valid to convey title to the strip.

The court also ruled that no easement by necessity arose when Hatch conveyed the strip to the railroad company because the trustees did not prove that that conveyance rendered Lot 2 landlocked.

The trustees appealed from the judgment that entered pursuant to the Land Court judge's decision. For somewhat different reason than those articulated by the trial judge, we conclude that he was correct that the trustees are estopped from denying the validity of the 1871 railroad deed. We also conclude that there was no error in the trial judge's determination that no easement by necessity was created for the benefit of what is now Lot 2 when the strip was sold in 1871.

Discussion. 1. Title to the strip. The trustees argue that the Land Court judge erred in considering subsequent instruments when determining the effect of the 1870 Hatch-Higgins deed. They contend that the 1870 Hatch-Higgins deed is unambiguous, and therefore must be interpreted without looking

5

to extrinsic evidence.  According to the trustees, the 1870 Hatch-Higgins deed validly conveyed the entire portion of the Hatch property containing Lots 1 and 2 and the strip, and it was recorded a mere two days later, so they argue that the 1871 railroad deed could not have conveyed the strip, as Hatch had no ownership interest to convey.  They also contend -- on the basis of the slender reed of the phrase "[m]eaning and intending to convey all Real Estate owned by the late Stephen Hatch, except the Woodland not herein described" -- that the trustees thus hold record title to the strip.

We conclude that we need not address this issue, because, assuming the trustees are correct about the effect of the 1870 Hatch-Higgins deed, they are equitably estopped from relying on it to argue that the 1871 railroad deed was ineffective.[5]

Estoppel in pais, or equitable estoppel, is an equitable doctrine.  For it to apply, there must be

> "(1) [a] representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) [a]n act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; and (3) [d]etriment to [the reliant] person as a consequence of the act or omission." (Quotations omitted).

---

[5] We do not read the judge's decision below to have rested on estoppel.  We think that the question of estoppel was adequately raised below by the Commonwealth's inclusion of it as an affirmative defense in its answer.

6

Renovator's Supply, Inc. v. Sovereign Bank, 72 Mass. App. Ct. 419, 426-427 (2008), quoting Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 123 (1992).

In this case, the trial judge found as a fact that the grantors in the 1874 Higgins-Wiley deed -- including Allen Higgins, who had knowledge of the 1870 Hatch-Higgins deed, and who, under the trustees' theory, was the title owner of the strip -- "acknowledged the effectiveness of the 1871 Railroad Deed, and believed that title to the disputed strip instead was held by the Railroad Company."  Subsequently, for the ensuing almost 150 years, neither Higgins, nor Wiley, nor any of his successors in interest challenged the validity of the 1871 railroad deed granting the railroad company the strip in fee simple.  The railroad company and its successors in interest relied on that deed and its purported conveyance of ownership in the strip in all their actions with respect to it.  This was not merely a result of inattention or lack of knowledge on the part of the trustees' predecessor in interest.  Rather, as the trial judge found, Higgins himself "acknowledged" in the 1874 Higgins-Wiley deed the effectiveness of the 1871 conveyance.

In this highly unusual circumstance, because of the deliberate decision by the trustees' predecessor in interest, Allen Higgins, who had all the information about the ownership

7

of the strip we do not have today over 150 years later, not to challenge the 1871 railroad deed, combined with the failure of any of his successors to raise the issue for another almost 150 years, and the reliance of those who owned the strip if the 1871 railroad deed were effective, the trustees are equitably estopped from challenging that deed.  This ratification of the conveyance in the 1871 railroad deed, and subsequent forbearance by Higgins and his successors to set up what title we are assuming they have, was "equivalent to consent to the conveyance, and an agreement not to set up [their] title against it."  Tracy v. Lincoln, 145 Mass. 357, 359-360 (1887).

2.  Easement by necessity.  This leaves the question, then, whether Wiley and his successors had or have an easement by necessity over the strip.  "A presumption of easement by necessity arises upon a showing of the following elements:  (1) unity of title; (2) severance of that unity by a conveyance; and (3) necessity arising from the severance, most often when a lot becomes landlocked."  Kitras v. Aquinnah, 474 Mass. 132, 140, cert. denied, 580 U.S. 1000 (2016).  The first two prongs of the test are met here; the only question is about the third.

To begin, the Commonwealth argues that the trustees are barred by the doctrine of laches from asserting the existence of an easement by necessity.  "Laches is an 'unjustified,

8

unreasonable, and prejudicial delay in raising a claim.'" Colony of Wellfleet, Inc. v. Harris, 71 Mass. App. Ct. 522, 531 (2008), quoting Srebnick v. Lo-Law Transit Mgt., Inc., 29 Mass. App. Ct. 45, 49 (1990). The unity of title here was severed, at the latest, in 1874 when Higgins conveyed Lots 1 and 2. Neither Wiley nor his successors sought to assert the existence of the alleged easement by necessity until 2016, when the trustees filed their complaint in this action. One hundred forty-two years seems like a long time to rest on one's rights, particularly where, as here, the rights depend on the presence or absence of roads and paths that no longer exist at the time the claim is asserted.

Nonetheless, because we are not certain whether a holding that this claim is barred by laches might have some unintended consequence, we turn to the merits of the claim.

The trial judge found that the trustees did not meet their burden of showing that the 1871 railroad deed left Lot 2 landlocked. The judge noted that an 1830 deed conveying the property at issue in this case -- and more -- to Hatch described the land as having "a road from Northeast corner of said field in the old road to the main road." The judge concluded that the main road was almost certainly the Old King's Highway, and that the "deed indicates, at the very least, the existence of a road

9

connecting the eastern side of what would become the Hatch Property to the Old King's Highway."  He construed the 1830 deed to appear to convey rights in that road to Hatch.  The judge's full analysis of the possible significance of the 1830 deed, as well as two earlier deeds from 1802 and 1805 that he found confirmatory of his reading of the 1830 deed, is included in his opinion.[6]  The judge concluded, finally, that the trustees had not met their burden to show by a preponderance of the evidence that this possible reading was in error, and that there was, by 1871, no road out of Lot 2.

The trustees argue that the judge erred in failing to conclude that they are entitled to a presumption of an easement by necessity, as "[it] is the presumed intent of the parties that when a parcel of land becomes landlocked as a result of a conveyance the land conveyed included rights of access." Kitras, 474 Mass. at 139.  The judge, however, concluded precisely that the trustees have not shown by a preponderance of the evidence that Lot 2 became landlocked in 1871.  The trustees point to evidence that

---

[6] The judge described an 1802 deed that conveyed an abutting parcel to Reuben Arey and "described it as being bounded by a 'cartway to the Country road, then Southerly by the Country road."  An 1805 deed conveying another abutting parcel also referred to "'a cartway to the Northeast Corner of Reuben Arey's land' that then connects to a public road."  The judge concluded that this cartway was likely the connecting road referenced in the 1830 deed that connected Lot 2 to the Old King's Highway.

"at the time of the alleged severance in 1871, Lot 2 was bounded to the west by the Disputed Strip, to the north by Blackfish Creek, and to the east and south by the lands of abutters Cornelius Rogers, Reuben Arey, and Solomon Rich. The evidence shows that neither the 1870 Hatch-to-Higgins Deed nor the 1874 Higgins-to-Wiley Deed, both of which conveyed the land comprising Lots 1 and 2, 'mention the existence of roads or cart-paths connecting the eastern boundary of the [conveyed parcel] to Old King's Highway.' Nor does either deed purport to grant any rights to cross any of the three abutting properties to the east and south."

The trustees also note that the Commonwealth's own expert stated that, if there had been a road leaving the eastern side of Lot 2, given the marshes in that area, the road would have had to make a U-turn and run south to the Old King's Road, something not shown on the plans in evidence. Given the totality of the record, none of this evidence, however, even if credited by the judge, required a finding that Lot 2 was landlocked.[7] We see no error in the trial judge's reading of the 1830 deed, nor in his conclusion that the trustees' evidence was insufficient to

---

[7] Nor did it make it "appear" it was landlocked, even if we were to assume the trustees are correct and that was their only burden. See Kitras, 474 Mass. at 141 (discussing land that "appear[s] to be landlocked").

11

demonstrate that the 1871 railroad deed rendered Lot 2 landlocked.

Judgment affirmed.

By the Court (Rubin, Massing & Desmond, JJ.[8]),

Clerk

Entered: September 23, 2024.

---

[8] The panelists are listed in order of seniority.

12