532                              54 Mass. App. Ct. 532 (2002)

Private Lending & Purchasing, Inc. *v.* First American Title Insurance Company.

PRIVATE LENDING & PURCHASING, INC. *vs.* FIRST AMERICAN
TITLE INSURANCE COMPANY.

No. 99-P-2128.

Suffolk. January 11, 2002. - April 18, 2002.

Present: LENK, MASON, & GRASSO, JJ.

*Insurance,* Title insurance, Misrepresentation, Agent's negligence, Unfair act
or practice. *Real Property,* Title insurance. *Damages,* Negligent
misrepresentation. *Negligence,* Title insurance company, Insurance agent.

In a civil action brought by a lender against a title insurer that did not disclose
the existence of "dragnet" clauses in prior mortgages listed in the excep-
tions portion of two policies of title insurance, the judge properly granted
summary judgment in favor of the title insurer on claims for breach of
contract [536-538], negligent misrepresentation [538-539], negligence
[539], and violations of G. L. c. 93A and G. L. c. 176D [539-540], where
there was no evidence that the title insurer agreed to do anything more
than issue the policies.

CIVIL ACTION commenced in the Superior Court Department on
April 24, 1998.

The case was heard by *Diane M. Kottmyer*, J., on motions for
summary judgment.

*Michael B. Roitman* for the plaintiff.

*James B. Fox* for the defendant.

GRASSO, J. We consider in this appeal whether a title insur-
ance policy that excepts a prior mortgage from its coverage
must specify that the excepted mortgage contains a "dragnet"
clause.[1] More generally, the question posed is whether, more
than merely referencing an excepted lien or encumbrance, the
"Schedule B Exceptions" to a policy of title insurance must

[1] A "dragnet" clause (sometimes called a cross-collateralization clause) is a
provision wherein the mortgage secures not only a specifically described
obligation but also all other obligations between the mortgagor and the holder,
whether then existing or later contracted.

also state with particularity aspects of the identified lien or encumbrance that may affect the amount secured by the mortgage. We hold that, absent an undertaking to do more than issue a policy of title insurance, a title insurer need not do more than properly identify an excepted lien or encumbrance in the Schedule B exceptions to coverage.

The issue arises in the following context. Private Lending & Purchasing, Inc. (Private Lending), appeals from the entry of summary judgment dismissing claims for breach of contract, negligent misrepresentation, negligence, and violations of G. L. c. 93A and c. 176D against First American Title Insurance Company (First American) concerning two title insurance policies.[2]

1. *Background.*

A. *The Triad loans.* In 1990, Triad Finance Corporation (Triad) loaned $275,000 to Jose and Annemarie Pereira. The promissory note to Triad was secured by five parcels of real property owned by the Pereiras. As part of the loan, Triad insisted upon a mortgagee's title insurance policy insuring the five parcels. Triad directed its attorney, R. David Cohen, to see to the documentation. In addition to his legal practice, Attorney Cohen was also authorized to issue title insurance policies as agent for First American.

Cohen conducted the requisite title examinations and discovered that the properties were encumbered by prior mortgages to Luso American Credit Union (Luso) and others. Cohen admittedly did not read the Luso mortgages, each of which contained a dragnet clause.[3] When the loan from Triad to the Pereiras closed, the prior mortgages from the Pereiras to Luso were listed in the "Schedule B exceptions from coverage"

---

[2]In pertinent part, the title insurance policies in question provide that "SUBJECT TO THE EXCLUSIONS FROM COVERAGE [AND] THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, . . . [First American] . . . insures . . . against loss or damage . . . sustained or incurred by reason of . . . [a]ny defect in or lien or encumbrance on the title."

[3]The dragnet clause reads: "It is also agreed that this Mortgage is security for the payment of the aforesaid obligation and all other direct and contingent liabilities of the Mortgagor hereof to the Holder hereof due or to become due, whether now existing or hereafter contracted."

in First American's $275,000 mortgagee's title insurance policy to Triad (the Triad policy). Schedule B of the Triad policy states in pertinent part:

"This policy does not insure against loss or damage by reason of any of the following: . . .

"Prop. 1: Mortgage to [Luso] in the original amount of $30,000.00.

"Prop. 2: Mortgage to [Luso] in the original amount of $70,000.00.

"Prop. 3: Mortgage to St. Joseph's Credit Union in the original amount of $45,000 and mortgage to [Luso] in the original amount of $40,000.00.

"Prop. 4: Mortgage to [Luso] in the original amount of $100,000.00.

"Prop. 5: Mortgage to George Peabody Cooperative Bank in the original amount of $100,000.00 and second mortgage to Blue Hill Federal Credit Union in the original amount of $50,000.00."

Other than identifying the prior Luso mortgages by reference to original dollar amount, the Schedule B exception to the Triad policy said nothing as to the existence or effect of the dragnet provisions in the Luso mortgages.[4]

B. *The Pace (Private Lending) loan and the Pace policy.* On June 19, 1991, Robert Pace, Private Lending's sole shareholder, loaned $75,000 to the Pereiras. The loan was to be secured by third and fourth mortgages on a number of residential properties in Beverly and Peabody, including those already subject to mortgages to Luso and Triad. Pace, who made high interest loans to individuals unable to obtain conventional financing from an institutional lender, retained Attorney Cohen to represent him. Pace also requested Cohen to obtain a mortgagee's title insurance policy in the amount of $75,000 on the mortgaged premises.

---

[4]The Triad policy referenced the Triad mortgage from the Pereiras not only by original amount but also by date of execution, date of recording, Registry of Deeds, and instrument number. The Schedule B exceptions omitted this helpful identifying information as to the Luso mortgages. Nothing turns on this omission. Private Lending does not contend that the excepted instruments refer to instruments other than those recorded senior mortgages known to Attorney Cohen.

Before closing the Pace loan, Cohen again conducted the necessary title examinations. Again, Cohen discovered and made note of the senior mortgages, including those to Luso and to Triad. Again, Cohen did not read the terms of the senior mortgages. Neither did Pace, who relied upon Cohen to determine the amount secured by the senior mortgages, to make sure that he was adequately secured, and to advise him of any problems or concerns with respect to the title.[5] In reliance on Cohen's title examination, the loan closed and, as agent for First American, Cohen issued a mortgagee's title insurance policy to Pace in the amount of $75,000 (the Pace policy). The "Schedule B Exceptions from Coverage" in the Pace policy set forth all the senior mortgages, including those to Luso and that to Triad. In particular, the Schedule B exceptions in the Pace policy listed the same properties and prior mortgages to Luso as were identified in the Triad policy, and in addition:

"Properties 1 through 5: Mortgage to [Triad] in the original amount of $275,000.00 . . . .

"Prop. 6: Mortgage to [Luso] in the original amount of $75,000.00."

As with the earlier Triad policy, other than identifying each senior encumbrance on each parcel by specifying the name of the senior lender and the original dollar amount of the senior mortgage obligation, the Schedule B exceptions in the Triad policy stated nothing as to the existence or effect of the dragnet provisions in the senior Luso mortgages.[6]

Pace subsequently sold the Pereiras' note to Private Lending. Thereafter, in February, 1993, Private Lending learned that the Luso mortgages contained dragnet clauses and notified First American. In September, 1993, Private Lending purchased the Triad loan with knowledge that the properties securing the note were subject to dragnet clauses in the Luso mortgages. In 1996, Private Lending purchased the Luso notes and thereafter

[5]Neither Pace nor Cohen contacted the senior mortgage lenders to obtain payoff information or estoppel letters or otherwise seek to determine the dollar amount of the debt that would be senior to Pace's loan.

[6]Again, the Pace policy listed the Pace mortgage from the Pereiras not only by original amount but also by date of execution, date of recording, Registry of Deeds, and instrument number, and omitted this information as to the senior Luso mortgages in the Schedule B exceptions. See note 4, *supra.*

proceeded to foreclose the first mortgages.[7] Foreclosure of the first mortgages resulted in a deficiency which serves as the basis for Private Lending's claim of loss under the Pace and Triad policies.[8]

Private Lending asserts that the dragnet clauses in the Luso loans are defects in, or liens or encumbrances on, title that should have been, and were not, disclosed in the respective title insurance policies. Private Lending formulates its claim as breach of contract, negligent misrepresentation, negligence, and violation of G. L. c. 93A and c. 176D.

2. *The contract claim.* The interpretation of a title insurance policy is a matter of law. See *Somerset Sav. Bank* v. *Chicago Tit. Ins. Co.*, 420 Mass. 422, 427 (1995). "In interpreting the provisions of a policy, we construe and enforce unambiguous terms according to their plain meaning." *Ibid.* Because there is no dispute that the senior mortgages that provided security for both the Triad and Pace loans were the same mortgages identified in the Schedule B Exceptions from coverage in the Triad and Pace title insurance policies, we hold that summary judgment was appropriately entered on the contract claim.

"A title insurance policy provides protection against defects in, or liens or encumbrances on, title." *Id.* at 428. Title insurance is neither an agreement to guarantee the state of title, nor a representation of title, but is more in the nature of a covenant of warranty against encumbrances. See *Falmouth Natl. Bank* v. *Ticor Title Ins. Co.*, 920 F.2d 1058, 1062 (1st Cir. 1990). See also *Focus Inv. Assocs., Inc.* v. *American Title Ins. Co.*, 992 F.2d 1231, 1237 (1st Cir. 1993).

An exception to a title insurance policy is a matter affecting title to the insured property that the insurer expressly excludes from the policy's coverage. See Burke, Title Insurance § 2.01, at 2-16, and § 9.01, at 9-3 (3d ed. 2000). The purpose of Schedule B is to identify matters affecting the insured property

---

[7]Had Private Lending purchased the Luso obligations and foreclosed the Luso mortgages prior to acquiring the Triad obligation, the junior Triad mortgages would have been wiped out. Because we hold that First American is not liable on its policies, we need not address the contention that Private Lending compounded its losses.

[8]Upon purchasing the Triad and Pace loan packages, Private Lending became an insured under the policies.

that are excepted from coverage. The identification of matters excepted in Schedule B is not the equivalent of a title abstract, a title search, or a representation as to title. See *Focus Inv. Assocs.* v. *American Title Ins. Co.*, 992 F.2d at 1237. Nor is the identification of excepted matters in Schedule B a substitute for a lender's own review of referenced instruments or due diligence.

Absent agreement to the contrary, First American had no duty to conduct a title search, provide a preliminary or final title report, or explain the legal effect of liens or encumbrances excepted from coverage.[9] See *Somerset Sav. Bank* v. *Chicago Title Ins. Co.*, 420 Mass. at 430-431. There is no record support for the contention that First American undertook contractually to do more than issue a policy of title insurance or that it voluntarily assumed duties in addition to the contract to insure title. *Ibid.* There is also no doubt, and hence no ambiguity, as to the particular mortgages to Luso that were specifically excepted in Schedule B as senior to the Triad and Pace loans.[10] Attorney Cohen found the Luso mortgages in his title search; the problem lay in his failure to read all the mortgage provisions. In effect, and contrary to the plain meaning of the policy, Private Lending attempts recovery under the policy not for an undiscovered or misindexed lien or encumbrance, but for one discovered and excepted from coverage.

Private Lending's contention, that failure to disclose the existence of a dragnet clause constitutes an undisclosed defect, lien, or encumbrance on title to the property, rests upon the erroneous conclusion that such a failure transforms the excepted lien or encumbrance into a defect in title. A mortgage is security for a note or other obligation. See Eno and Hovey, Real Estate Law § 9.1, at 194 (3d ed. 1995) Schedule B of the Pace and Triad policies took exceptions to identified instruments, the Luso mortgages, not to certain terms or provisions of the mortgages,

[9]Explanation of the legal effect of liens or encumbrances may fall within the practice of law, to be conducted by a lawyer rather than the insurer. See *Lowell Bar Assn.* v. *Loeb*, 315 Mass. 176, 183 (1943).

[10]We can envision circumstances, not present here, in which a description of the excepted lien or encumbrance may be so indefinite as to create uncertainty regarding the excepted instrument or affect the ability to locate and examine the excepted instrument.

or to the legal effect of those instruments. The dragnet clause provision does not create a separate lien or encumbrance beyond the mortgage itself; rather, it expands the scope of the obligation that the mortgage secures.

We also reject Private Lending's argument that the term "in the original amount of," used in Schedule B to describe the Luso mortgages, limits the amount secured by that mortgage and thereby limits the amount that can be excepted from coverage for the specified mortgage. The exception to coverage is to the lien or encumbrance of the mortgage and precludes coverage for matters relating to that lien or encumbrance. As used in Schedule B, the words "in the original amount of" are words of identification, not words of limitation. These words describe and identify the mortgage that is excepted. This case is distinguishable from *Southwest Title Ins. Co.* v. *Northland Bldg. Corp.*, 552 S.W.2d 425, 429 (Tex. 1977), in which the policy exception at issue made reference to specified notes or indebtedness. Schedule B of the First American policies made no reference to notes or indebtedness secured by the Luso mortgages.

Having decided as a matter of contract interpretation that the Luso mortgages are unambiguously *excepted* from coverage under Schedule B, we need not opine whether the motion judge was correct in concluding that Private Lending is also barred from recovery by an "Exclusions from Coverage" provision, which excludes from coverage loss or damage arising by reason of encumbrances, adverse claims, or other matters "created, suffered, assumed or agreed to by the insured claimant."[11]

3. *Negligent misrepresentation.* Private Lending's claim for negligent misrepresentation lacks the reliance required for such an action. The contention that Pace relied upon the First American title insurance policy and would not have loaned money to the Pereiras had the policies described the Luso mortgage dragnet clauses is contrary to the record. At his deposition, Pace testified that he relied upon his attorney, Cohen, to

---

[11]The judge reasoned that, because Private Lending purchased the Triad loans for fifty-five percent of their face value with knowledge of the existence and effect of the cross-collateralization clauses in the Luso mortgages, Private Lending had created its own loss.

determine the amount of the encumbrances, to make sure that he was adequately secured, and to advise him of any problems with the security. See *Nota Constr. Corp.* v. *Keyes Assocs., Inc.*, 45 Mass. App. Ct. 15, 19-20 (1998). As discussed previously, nothing in the record suggests that First American, through its agent Cohen, or otherwise, agreed to search the title, prepare a title report, or assume any duty to Pace apart from issuing the policy.

4. *Negligence.* Private Lending's negligence action fails because First American owed no duty to Pace to disclose the existence of dragnet clauses or other provisions of the excepted mortgages. A title insurer's duty is governed by the terms of the policy. *Somerset Sav. Bank* v. *Chicago Title Ins. Co.*, 420 Mass. at 430. Absent evidence, not present here, that the insurer voluntarily assumed duties in addition to issuance of a title policy, our appellate courts have declined to impose a duty upon a title insurance company to search for, and to disclose to the insured, any reasonably discoverable information that would affect the insured's decision to proceed with the purchase. *Id.* at 430-431. See *Focus Inv., Assocs., Inc.*, v. *American Title Ins. Co.*, 992 F.2d at 1235-1236. As discussed previously, First American did not undertake to do more than issue a policy of title insurance to Triad or to Pace. Thus, First American may not be found directly liable in negligence because the act complained of was not a direct result of duties voluntarily assumed by First American, in addition to its contract to insure title. See *Somerset Sav. Bank* v. *Chicago Title Ins. Co.*, 420 Mass. at 431.

Neither did Cohen, as agent of First American, owe Pace such a duty. Any negligence of Cohen in not reading the senior mortgages or disclosing the dragnet clauses to Pace arose in Cohen's capacity as attorney for Pace, not as agent for First American, and is not an issue in this case. Pace's deposition establishes his expectations of Cohen as his attorney. The problem complained of arose from Cohen's not reading and disclosing the dragnet clauses to his client.

5. *Chapter 93A and c. 176D.* We agree with the motion judge that Private Lending's statutory claims for unfair and deceptive business and insurance practices rest entirely upon its contract

and negligent misrepresentation claims. See *Timpson* v. *Transamerica Ins. Co.*, 41 Mass. App. Ct. 344, 353 (1996) (insurer did not commit an unfair act or practice by denying defense where there was no coverage under the policy). See also *Boston Symphony Orchestra, Inc.* v. *Commercial Union Ins. Co.*, 406 Mass. 7, 14-15 (1989) (no G. L. c. 93A or c. 176D liability where an insurer, in good faith, relied upon a plausible, although ultimately incorrect, interpretation of a policy).

Accordingly, we conclude that the Schedule B exceptions to coverage apply and that the Luso mortgages are not a defect, lien or encumbrance on title for which First American is liable under its title insurance policies.

*Judgment affirmed.*