# DECISIONS

## OF THE

## APPEALS COURT

### OF

## MASSACHUSETTS

WELLS FARGO BANK, NATIONAL ASSOCIATION[1] vs. NATIONAL
LUMBER COMPANY.

No. 08-P-2082.

Suffolk. November 3, 2009. - December 11, 2009.

Present: KAFKER, WOLOHOJIAN, & MILKEY, JJ.

*Practice, Civil,* Summary judgment. *Real Property,* Mortgage. *Mortgage,* Real
estate, Priority. *Subrogation.*

In a suit brought in Land Court by a plaintiff bank seeking equitable subroga-
tion of the mortgages granted by a landowner on certain property, the judge
erred in granting summary judgment in favor of the plaintiff (and thereby
placing the plaintiff's mortgage in a priority position over the mortgage held
by the defendant), where fuller factual development was required regarding
the equitable interests of both mortgagees. [5-8]

CIVIL ACTION commenced in the Land Court Department on
October 1, 2007.

---

[1]On behalf of the Certificate Holders of Morgan Stanley ABS Capital I Inc.
Trust 2005-WMC2 Mortgage Pass-Through Certificates, Series 2005-WMC2.

The case was heard by *Charles W. Trombly, Jr.*, J., on a motion for summary judgment.

*Mark E. Barnett* for the defendant.

*Meredith A. Swisher* (*James B. Fox* with her) for the plaintiff.

KAFKER, J. Wells Fargo Bank (Wells Fargo) brought suit against National Lumber Company (National) seeking equitable subrogation of the mortgages granted by David Naginewicz (owner) on property located at 116 John Street in Ludlow (property). The Land Court allowed Wells Fargo's motion for summary judgment, thereby placing its mortgage in a priority position. We conclude that fuller factual development regarding the equitable interests of both mortgagees is required and therefore reverse the decision of the Land Court.

1. *Facts.* The major parties are the plaintiff, Wells Fargo, as assignee; the defendant, National; and the property owner. As of March 4, 2002, the only mortgage on the property was a first mortgage granted to Mortgage Electronic Registration Systems (MERS), as nominee for Flagstar Bank (Flagstar). On June 4, 2002, the owner granted a second mortgage on the property to National (National mortgage I) to secure business debts owed by Yankee-Crafted Homebuilding, Inc. (Yankee), a company of which the owner was president. National was aware that National mortgage I was a second mortgage.

On November 17, 2003, the owner refinanced, granting a first mortgage to MERS, as nominee for Novastar Mortgage, Inc. (Novastar). In connection with this refinancing, the Flagstar mortgage was discharged. To facilitate this refinancing, National discharged National mortgage I and accepted a similar mortgage (National mortgage II) after the recording of the Novastar mortgage. This allowed Novastar to obtain first priority and National to retain its second mortgage status, in conformity with the parties' intentions. National mortgage II did not specify an amount owed to National, instead securing "full payment of all current and future obligations of [Yankee]."[2] The owner refinanced again on November 8, 2004 (recorded November 12, 2004), granting a mortgage to MERS, as nominee for WMC Mortgage Corp. (WMC). WMC intended for the WMC mortgage to be a first mortgage on the property. Using funds from the WMC loan, the

[2]See note 3, *infra.*

Novastar mortgage was subsequently discharged in the full amount of $135,776.01 (signed on February 18, 2005, and recorded on March 4, 2005).

Gregory Bell was the attorney representing WMC at the November, 2004, closing. He was also the agent for First American Title Insurance Company (title insurer), which issued the title insurance policy for the WMC mortgage. Bell conducted a title search approximately one week prior to closing. The search revealed the existence of National mortgage II (previously undisclosed by the owner). Bell asserted that he intended to obtain either a discharge or a subordination of National mortgage II before closing so that WMC would have first priority on the property. He stated that a handwritten checklist of disbursements prepared by his secretary reflected that intention. He also said that he contacted the owner who reportedly told Bell that a discharge or subordination "could be done." Although the reasons for his failing to do so are unclear, it is undisputed that Bell failed to contact National regarding the refinancing or to obtain such a discharge or subordination. Bell stated in his deposition that he nonetheless believed that the WMC mortgage was in first position after the closing (i.e., he believed that the discharge or subordination had been obtained), and did not realize his error until 2006.

In November, 2004, Yankee's obligation to National was over $100,000. After the November, 2004, closing, National extended additional credit to the owner in the aggregate sum of approximately $200,000. These monies were secured by National mortgage II, which included a dragnet clause.[3]

National's chief executive officer, Steven Kaitz, stated that he extended the credit after directing one of his employees to conduct a title search on the property and learning that National

---

[3]A dragnet clause is a provision in a mortgage that not only secures the obligation described in the mortgage, but also all other obligations between the mortgagor and mortgagee, "whether then existing or later contracted." *Private Lending & Purchasing, Inc.* v. *First American Title Ins. Co.*, 54 Mass. App. Ct. 532, 532 n.1 (2002). Depending on the outcome of the trial on the issue of equitable subrogation, the trial judge may need to consider the scope of the dragnet clause included in the National mortgage II. See *NAB Asset Venture III, L.P.* v. *Brockton Credit Union*, 62 Mass. App. Ct. 181, 185 (2004) ("if lenders intend to retain priority under a dragnet clause for future advances as against intervening lienors, the language effecting that intent should be explicit").

mortgage II was ahead of the WMC mortgage on the title to the property. Kaitz stated in his deposition: "Once the mistake was made by WMC, if in fact it was a mistake, we then were in first position. I supplied a lot of materials to [Yankee] based on the fact that we were then in first position." Exactly what type of title search was undertaken and what it disclosed, however, is unclear. The Novastar mortgage discharge was not signed until February 18, 2005, nor recorded until March 4, 2005.

Kaitz also stated that he informed the owner in November, 2004, that National had priority, and that in light of that development he would continue to extend credit. Kaitz stated that the owner expressed surprise to learn that National had first priority as the owner did not think that National was in that position.

The WMC mortgage was sold, as of December 20, 2004, to Morgan Stanley Mortgage Capital, Inc. (Morgan Stanley), which securitized the mortgage before selling it to Wells Fargo (the plaintiff here) as trustee in March, 2005. Apparently neither Morgan Stanley nor Wells Fargo conducted a title search or purchased title insurance.

In March or April of 2006, Bell reviewed the title of the property at the registry of deeds at the request of the owner, who had asked Bell to determine if a declaration of homestead had been recorded. Bell then discovered the failure to discharge or subordinate the National mortgage II, and contacted National. National informed Bell that it would not subordinate its mortgage because Yankee was behind in its obligations to National. Thereafter, every six weeks or so for the next several months, Bell contacted the owner to inquire whether he had convinced National to subordinate National mortgage II. In November of 2006, after being informed by the owner that National would not subordinate, Bell forwarded a "Notice of Potential Claim" to the title insurer that the WMC mortgage was subject to National mortgage II.

In 2007, Wells Fargo discovered the National mortgage II through a title examination conducted in connection with foreclosure proceedings. Wells Fargo filed its complaint for equitable subrogation on October 1, 2007. The Land Court allowed Wells Fargo's motion for summary judgment on October 23, 2008, placing the WMC mortgage held by Wells Fargo in the priority position to the extent of the amount advanced to discharge the Novastar mortgage, which was $135,776.01.

2. *Discussion.* The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as matter of law. Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002).

Wells Fargo contends that equitable subrogation was properly allowed because Bell's failure to obtain a subordination or discharge of National mortgage II was simply a mistake, and that any reliance on the mistake by National was unjustified as National understood a mistake had been made. National responds that equitable subrogation was improperly allowed because it relied on first priority status in extending additional credit, and that Bell's failure to obtain a subordination or discharge in these circumstances did not constitute a "mistake" but rather deliberate or reckless misconduct in light of his knowledge of National's mortgage.

"Equitable subrogation is an exception to the basic . . . 'first in time is first in right' " rule for mortgage priority. *East Boston Sav. Bank* v. *Ogan*, 428 Mass. 327, 329 (1998). Subrogation allows one party who paid the debt of another to be entitled to the rights, remedies, or security enjoyed by the original creditor, provided an injustice would not be imposed on any junior lienholder. See *id.* at 328-329. "In other words, the new mortgage given by a mortgagor, who used the proceeds of the new mortgage to extinguish an earlier mortgage, may receive the same priority once given to the earlier mortgage." *Id.* at 330.

The Supreme Judicial Court has stated that "[t]he question whether to apply subrogation depends on a balance of the interests of the competing mortgagees because '[t]he right to subrogation rests upon equity.' " *Id.* at 329, quoting from *Massachusetts Hosp. Life Ins. Co.* v. *Shulman*, 299 Mass. 312, 316 (1938).[4] The actions of both mortgagees are examined. In examining the subrogee's actions, "a court must determine [that] '(1) the subrogee made the payment to protect his or her own interest, (2) the subrogee did not act as a volunteer, (3) the subrogee was not primarily liable for the debt paid, (4) the subrogee paid off the entire encumbrance, and (5) subrogation would not work any injustice

---

[4]Of course other remedies, including title insurance claims and malpractice actions, may be available or more appropriate depending on the circumstances.

to the rights of the junior lienholder.' " *East Boston Sav. Bank* v. *Ogan*, 428 Mass. at 330, quoting from *Mort* v. *United States*, 86 F.3d 890, 894 (9th Cir. 1996). Because equitable subrogation is a broad equitable remedy, it may apply even where one or more of these factors are missing. *East Boston Sav. Bank* v. *Ogan*, 428 Mass. at 330. Factors (1), (2), (3), and (4) are satisfied in this case. The parties do not contend otherwise on appeal.

The fifth factor is disputed here. The Supreme Judicial Court has noted that "[n]egligence of one which does not induce a change of position of another is not a bar to recovery in cases of subrogation." *Id.* at 332, quoting from *Worcester N. Sav. Inst.* v. *Farwell*, 292 Mass. 568, 574 (1935). See *Provident Coop. Bank* v. *James Talcott, Inc.*, 358 Mass. 180, 186, 189 (1970). National claims, however, that the subrogee's admitted negligence, which National describes as recklessness or possibly even malfeasance, did lead to a change in its position. National claims to have relied on its first priority status in extending additional monies to the owner.[5] Wells Fargo's response is that National knew that the only reason that it had a first mortgage position was because WMC had mistakenly failed to seek a discharge or subordination of the National mortgage II, and therefore any such reliance was unjustified. We consider National's knowledge on this question, that is, whether it had knowledge that it had a first mortgage, and if so, whether it knew that WMC had made a mistake, to be disputed factual questions material to the balancing of equities. Kaitz's deposition testimony does not conclusively resolve either of these questions and his testimony and credibility must be evaluated by the fact finder at trial.[6] Likewise at issue is the extent of subrogee culpability in causing the priority problem, particularly the conduct of subrogee's counsel. Although constructive and even actual knowledge of the lien is

---

[5]We intimate no view on the question whether such reliance, if proved, would operate to place the National mortgage II in first lien position, or would instead merely grant first priority to the additional monies advanced based on such reliance.

[6]Kaitz contended that a title search undertaken in November, 2004, revealed that the National mortgage II was in first position. His deposition testimony is, however, inconsistent with the timing of the signing and recording of the discharge of the Novastar mortgage, which did not occur until February and March of 2005. Also unclear from Kaitz's testimony is whether he understood that a mistake had been made by WMC at the time he extended additional credit to Yankee.

not necessarily fatal to a claim of equitable subrogation in Massachusetts, "[t]he degree of knowledge attributable to a subrogee concerning the existence of the intervening mortgage may nullify equitable subrogation." *East Boston Sav. Bank* v. *Ogan*, 428 Mass. at 331. See Restatement (Third) of Property (Mortgages) § 7.6 comment d, at 518-519 (1997). Additionally, "[t]he subrogee's behavior is an important consideration that the court must balance in its equitable analysis of the interests of both mortgagees." *East Boston Sav. Bank* v. *Ogan*, 428 Mass. at 332. In deciding whether to allow for equitable subrogation, courts therefore take into account both the degree of the subrogee's knowledge of the intervening mortgage and the subrogee's associated actions.

In the instant case, the subrogee had actual knowledge of the intervening mortgage as it had been identified during the title search. Nevertheless no subordination or discharge was sought. Nor, as National notes, is it clear that National would have "reflexively" subordinated or discharged its mortgage without further consideration, given Yankee's outstanding obligations. National was under no obligation to subordinate or discharge its loan, except on payment in full. Accordingly, the failure of Bell (on behalf of WMC) to request subordination or discharge deprived National of the opportunity to demand that it be paid in full (or to have its debt balance reduced or additional security provided) in exchange.[7] National therefore argues that the failure to seek a subordination or discharge might not, in these circumstances, have been a mere negligent mistake but rather, "reckless, deliberate, unprofessional, incompetent, and possibly misfeasant." See, e.g., *Fidelity Mgmt. & Research Co.* v. *Ostrander*, 40 Mass. App. Ct. 195, 200 (1996), quoting from *United States* v. *Perez-Torres*, 15 F.3d 403, 407 (5th Cir. 1994) (" 'the doors of equity' are closed 'to one tainted with inequitableness or bad faith relative to the matter in which [he] seeks relief' "). Although the failure to contact National may have simply been an oversight, and thus merely "innocent, unfortunate neglect," *Provident Coop. Bank* v. *James Talcott, Inc.*, 358 Mass. at 186, there are too many unanswered questions regarding Bell's course of conduct to decide this issue on summary judgment. His testimony and credibility, like Kaitz's, must be tested and evaluated at trial.

---

[7]In 2006, National demanded and received from the owner an additional mortgage for other property because of the continuing outstanding debt.

In sum there are material disputed issues of fact regarding (1) National's reliance on first priority status in extending the owner additional credit after the November, 2004, closing; and (2) the subrogee's culpability in failing to secure a discharge and subordination of the National mortgage II that it knew about prior to the November, 2004, closing. As the equities remain murky here, a trial is required.[8]

*Judgment reversed.*

---

[8]Our decision reversing the allowance of summary judgment is not premised on National's argument that Wells Fargo acquired the WMC mortgage with knowledge of the title defect arising from National mortgage II. This factual assertion is not supported by the summary judgment record. Wells Fargo, as trustee, was assigned the WMC mortgage in March, 2005. National, however, asserts that Wells Fargo accepted the assignment in August, 2007 (and therefore with full knowledge that there was a priority issue). The August, 2007, date, however, was actually the date of recording of the assignment, not the date on which Wells Fargo became the legal holder of the WMC mortgage. Wells Fargo was the holder of the WMC mortgage beginning in 2005 (prior to the discovery of the title defect). The failure of Wells Fargo to conduct a title search, however, is a relevant factor for the judge to consider at trial when determining the equities.