Connor, John P., J.
INTRODUCTION
This is an action by plaintiff Bank of New York, as Trustee for the Certificate Holders of CWALT, Inc., Asset-Backed Certificates, Series 2007-02CB (“BNY”), the assignee and current holder of a note originated by Quicken Loans, Inc. (“Quicken”) and secured by a mortgage on property located at 57 North Avenue, Mendon, Massachusetts (the “Property”). BNY claims that its mortgage has priority over a competing lien held by the defendants, Medway Lumber & Home Supply, Inc. (“Medway Lumber”), based on the doctrines of equitable estoppel and equitable subrogation.[3] The court conducted a juiy-waived trial from August 8, 2010 to August 12, 2010. Based on all the credible evidence and the reasonable inferences to be drawn therefrom, the court finds the following facts.
FINDINGS OF FACT
1. Beginning in the early 1990s, Medway Lumber made a series of secured and unsecured loans to Earl Berthiaume (Berthiaume), its customer, and his wife Elizabeth (together with Berthiaume, the “Berthiaumes”), including a 1997 loan through Medway Lumber’s Profit Sharing Trust in the amount *128 of $75,000 (the “1997 Loan”), which allowed Berthiaume to purchase property located at 57 North Avenue, Mendon, Massachusetts.[4]
2. After paying off the 1997 Loan, in or around December 9, 2004, the Berthiaumes executed a first mortgage on the Property in the principal amount of $199,400, plus interest in favor of Citizens Bank (the “Citizens Mortgage”). (Exhibit 6.)
3. In 2005, Berthiaume approached Peter Longo-bardi (Longobardi), president of Medway Lumber, requesting a loan to help his son’s excavating business. Longobardi, through Medway Lumber, lent the Berthiaumes $225,000 (the “Medway Lumber Loan”). On October 5, 2005, the Berthiaumes executed a promissoiy note agreeing to repay the loan “in or within one (1) year” and to make interest-only payments of $1,500 per month beginning on November 5, 2005 until the loan was paid in full (the “Medway Lumber Note”). (Exhibit 9.) The defendant defaulted by failing to make payment in full by the maturity date.
4. At the time Medway Lumber extended the funds and took a mortgage on the Property, it knew the Property was encumbered by the first mortgage to Citizens. In fact, the Medway Lumber Mortgage expressly acknowledged that it was “(s)ubject to a prior mortgage to Citizens Bank in the original principal amount of $199,400.” (Exhibit 9.) Medway Lumber always anticipated and expected to have a second mortgage on the Property.
5. Shortly after issuing this loan, in November and December 2005, Longobardi extended Berthiaume a series of unsecured loans totaling $70,000. (Exhibits 82-84.) Medway Lumber also lent Berthiaume $40,000 as an unsecured loan in July 2006. (Exhibit 17.)
6. On or about June 2006, Berthiaume informed Longobardi that he was refinancing the Property and Berthiaume applied for a loan with CCO Mortgage Corp. (“CCO”). (Exhibit 11.) To qualify for the loan, the Berthiaumes:
grossly overstated their income representing to CCO that they made $10,000 per month;[5]
intentionally omitted specific debts including the Medway Lumber Mortgage;
and made specific representations that “there are no outstanding claims, bills, liens, attachments, pending suits or attachment petitions of any kind or character . . .’’on the Property.
7. In anticipation of the closing, CCO retained Residential Title & Escrow Services, P.C. (“Residential Title”) to review and certify title, ensure it had a first lien on the Property, and to close the loan. Residential Title was specifically instructed not to close the loan unless CCO had a first lien position.
8. Accordingly, Residential Title conducted a title search on the Property and identified the Medway Lumber Mortgage as an outstanding encumbrance. (Exhibits 13-15.) In an effort to clear title, on July 14, 2006, a representative from Residential Title left a message for Longobardi, which he received, requesting a discharge of the Medway Lumber Mortgage. In particular, the representative identified the book and page number for the Medway Lumber Mortgage, requested a copy of a discharge of that mortgage, provided Residential Title’s fax number, and asked that a copy of the discharge be faxed.
9. The next day, Longobardi prepared, signed, had notarized, and faxed the discharge for the Medway Lumber Mortgage to Residential Title (the “Medway Lumber Discharge”). (Exhibit 16.) At no time did Lon-gobardi represent that Medway was owed any money.
10. Longobardi made no effort to contact Residential Title, either by written correspondence or by telephone, to inform it that the discharge was conditioned on payment of the mortgage.
11. Residential Title relied on the Medway Lumber Discharge in certifying title to CCO. Frank Lombardi, a closing attorney formerly of Residential Title who has closed approximately 5,000 loans and who was retained to close the CCO Loan, testified that it is part of his custom and practice to accept a faxed copy of a mortgage discharge in certifying title and closing a loan. He further testified that such a practice complies with the Massachusetts Real Estate Bar Association’s standards. Consequently, I find that Residential Title’s and thus, CCO’s, reliance on the Medway Lumber Discharge was reasonable.
12. In reliance on the discharge, CCO issued a loan to the Berthiaumes in the amount of $203,000 (the “CCO Loan”) to refinance the Citizens Mortgage, believing it had a first lien on the Property. The Berthiaumes executed a promissory note agreeing to repay this amount, which was secured by a mortgage on the Property (the “CCO Mortgage”).
13. $200,372.45 of the proceeds from the CCO Loan paid off the Citizens Mortgage in full and Citizens discharged its mortgage. (Exhibit 30.)
14. In December 2006, Berthiaume applied for another “no income verification” loan to refinance the Property, this time with Quicken. To qualify for the loan, Berthiaume yet again:
grossly overstated his income representing to Quicken that he made $12,500 per month;
intentionally omitted specific debts, including the Medway Lumber Mortgage and $725,000 due to ERA Mortgage Company for an October 27, 2006 loan given to the Berthiaumes to purchase property located at 13 Hartford Avenue East, Mendon, Massachusetts (“the Hartford Avenue Property”);
and made specific representations that “no other persons have any interest and title, in equity or otherwise, to said premises.
15. In anticipation of the closing, Quicken retained Title Source, Inc. (“Title Source”) to review title and ensure it had a first lien on the Property. (Exhibit 87.) *129 After a title search revealed outstanding encumbrances on the Property, on December 14, 2006, Kasey Ervin (“Ervin”), a title analyst from Quicken, contacted Berthiaume to discuss the outstanding liens, including the Medway Lumber Mortgage and the prior 1997 Loan.[6] Berthiaume told Ervin that he had an original discharge for the Medway Lumber Mortgage and would fax it to her, along with Medway Lumber’s contact Information so Ervin could secure a discharge for the 1997 lien. (Exhibit 86.) Shortly thereafter, Berthiaume faxed Ervin a copy of the Medway Lumber Discharge, the Quitclaim Deed, and Longobardi’s contact information. (Exhibit 86.) (Exhibit 85.) Based on the discharge, Ervin believed the Medway Lumber Mortgage had been satisfied.
16. On or about December 18, 2006, Ervin contacted Longobardi, informed him that Berthiaume was applying for a loan to refinance the Property, and requested a discharge of the 1997 lien, which Longo-bardi provided. (Exhibit 86.) (Exhibit 44.) At trial, Longobardi admitted that at no time did he explain to Ervin that Medway Lumber was owed money from Berthiaume or that the Medway Lumber Mortgage was outstanding.
17. In reliance on the Medway Lumber Discharge, Quicken issued a loan to Berthiaumes in the amount of $318,675 (the “Quicken Loan”) believing it had a first lien on the Properly. (Exhibit 86.) I find that Quicken’s reliance on the discharge was reasonable.
18. At the closing, the Berthiaume’s executed a promissory note (the “Quicken Note”) and mortgage on the Property in favor of Quicken (“the Quicken Mortgage”).[7]
19. $203,909.21 of the loan proceeds paid off CCO’s mortgage in full and CCO discharged its mortgage. (Exhibit 63.)
20. On or about January 1, 2007, Quicken sold the loan to Countrywide Bank, N.A. and transferred the Quicken Note. (Exhibit 52.) The Quicken Loan and Note were then transferred to Countrywide Home Loans, Inc. who grouped the Quicken Loan with other residential loans in a pool and transferred the loans to CWALT, Inc., as Depositor. (Exhibit 55.) CWALT, Inc. deposited the loans into a trust for which BNY serves as the trustee. Although the Quicken Note was previously transferred to the trust, a formal assignment of the Quicken Mortgage was later executed in favor of BNY, as trustee, to allow it to foreclose on behalf of the trust. (Exhibit 71.) BNY is the current holder of the Quicken Note, which is indorsed in blank, and the Quicken Mortgage. (Exhibits 52, 71.)
21. While the Berthiaumes made two payments via check totaling $60,000 to Longobardi in October 2006 and January 2007, these payments were not applied to the Medway Lumber Note. Rather, Longobardi applied them to the $70,000 personal loan he extended to the Berthiaumes after the Medway Lumber Loan even though the checks did not direct the payment in this manner.
22. Despite the fact that the Medway Lumber Note was in default, Medway Lumber made no effort to collect the balance. Instead, on or about March 2, 2007 and May 26, 2007, Medway Lumber advanced $75,000 in additional funds to Berthiaume in anticipation of taking a mortgage on the Hartford Street Property. (Exhibits 64-65.) Merely a few days later, on June 4, 2007, Berthiaume filed a Chapter 7 Voluntary Petition for Bankruptcy. (Exhibit 66.) Conspicuously omitted irom Berthiaume’s petition was the Medway Lumber Mortgage in Schedule D as a creditor holding a secured claim.
23. In or around late July 2007, Longobardi became aware that Berthiaume had filed for bankruptcy. Nevertheless, between June 30, 2007 and September 5, 2008 Medway Lumber extended $45,000 of credit to Berthiaume (over $20,000 of which was extended after July 17, 2010) to allow him to purchase materials. (Exhibit 68.) Berthiaume told Longobardi that he would repay at least a portion of these funds from the proceeds of a pending insurance claim.
24. In connection with the extension of cash and credit, in October 2007, Medway Lumber required Berthiaume’s wife to execute a note and mortgage in the amount of $150,000 on the Hartford Avenue Property. (Exhibits 70, 72.)[8] Longobardi did not perform any due diligence to determine if Elizabeth Berthiaume had the ability to repay the loan.
25. After Berthiaume defaulted on the Quicken Loan and filed for bankruptcy, BNY sought and was granted relief from the automatic stay to allow it to foreclose on the property. When BNY began foreclosure proceedings, however, a title examination revealed that the Medway Lumber Discharge had not been recorded. (Exhibit 69.)'
26. Thereafter, in or a January2008, BNYs foreclosure attorney contacted Longobardi requesting a confirmatory discharge for the Medway Lumber Mortgage. (Exhibit 74.) Based on this correspondence, Longobardi was aware that BNY claimed it had a first lien on the Property, challenged the priority of Medway Lumber’s mortgage, and intended to foreclose. However, Longobardi made no effort to foreclose or collect on the mortgage.
27. Longobardi waited another nine months, until September 9, 2008, to send the Berthiaumes its first Notice of Default related to the Medway Lumber Mortgage. (Exhibit 79.) By this time, the mortgage had been in default for nearly two years.
28. On or about December 10, 2008, Medway Lumber commenced foreclosure proceedings on the Property. Pursuant to a stipulation filed with this Court on Januaiy 16, 2009, the parties agreed that Medway Lumber would conduct a foreclosure sale and the proceeds from that sale would be deposited into a joint escrow account. On or about September 30,2009, the Property was sold at a foreclosure sale for $234,000. The proceeds from that sale are currently being held in escrow at Citizens Bank. The current balance of the escrow account is $235,021.08.
*130 29. BNY is owed over $400,000 on the Quicken Mortgage. (Exhibit 81.)
RULINGS OF LAW
A. DOCTRINE OF EQUITABLE ESTOPPEL
In Massachusetts the principle of equitable estoppel functions to prevent one from benefitting from his own wrongdoing and to avoid injustice. The Renovator’s Supply, Inc. v. Sovereign Bank, 72 Mass.App.Ct. 419, 426 (2008). “It is in the main to accomplish the prevention of results contrary to good conscience and fair dealing that the doctrine of estoppel has been formulated and taken its place as a part of the law.” MacKeen v. Kasinskas, 333 Mass. 695, 698 (1956). The essential factors giving rise to an estoppel are (1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; (3) detriment to such person as a consequence of the act or omission. Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 123 (1992), quoting Cleaveland v. Malden Sav. Bank 291 Mass. 295, 297-98 (1935). Furthermore, “the detrimental reliance by the party claiming estoppel must be reasonable.” Turnpike Motors Inc., v. Newbury Group Inc., 413 Mass. 119, 125(1992); Weston Forest and Trails Assoc., Inc. v. Fishman, 66 Mass.App.Ct. 654, 659 (2006).
This court finds that the elements necessary to establish a claim of equitable estoppel are present here. Longobardi, on behalf of Medway Lumber, prepared, signed, and had notarized a discharge for the Medway Lumber Mortgage in response to a specific request from a representative of Residential Title, CCO’s title agent. When Longobardi faxed the Medway Lumber Discharge to this agent, without any indication that it was contingent on payment, he was making a representation indicating that the Medway Lumber Mortgage had been satisfied. The court finds it reasonable to assume that Longobardi, who had significant experience in making loans to the Berthiaumes that were secured by real property, should have known that requests for discharges are typically requested in the context of lending money and that such a representation could induce a party to move forward with extending funds. Although Longobardi contends that he was not sure where the fax was being sent, he should have known that faxing a discharge that in no way indicated it was contingent on payment could be misleading. ‘While the doctrine of estoppel rests upon the ground of fraud, it is not essential that the representations or conduct giving rise to its application should be fraudulent in the strictly legal significance of that term, or with intent to mislead or deceive; the test appears to be whether in all the circumstances of the case conscience and duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct...” Moran v. Gala, 66 Mass.App.Ct. 135, 140 n.10 (2006), quoting from McLearn v. Hill, 276 Mass. 519, 525 (1931).
The defendants claim that equitable estoppel does not apply to the Quicken Mortgage (now held by BNY) as Longobardi never made a representation to Quicken directly indicating that the Medway Lumber Mortgage had been discharged. They also claim that Quickens’ reliance on the Medway Lumber Discharge was unreasonable in that at the time when they extended funds, the Medway Lumber Discharge that they relied upon was over seven months old and still unrecorded. The title search executed by Quickens agent revealed both the 1997 Medway Trust Mortgage and the Medway Lumber Mortgage as outstanding liens. In attempting to clear title, Ervin, Quicken’s title analyst, received the faxed copy of the Medway Lumber Discharge, regarding the Medway Lumber Mortgage, from Berthianme who also encouraged him to contact Longobardi. Ervin then contacted Longobardi, indicated to him that she was attempting to clear title in expectation of a refinance, and requested that Longobardi provide her with the discharge from the 1997 Medway Trust Mortgage. Although Longobardi was aware of the fact that the Medway Lumber Loan was still outstanding, at no point during this conversation did he bring this to Ervin’s attention. A representation for purposes of equitable estoppel may include conduct which is calculated to convey the impression that the facts are otherwise than those which the party subsequently seeks to assert. See Amtrust Bank v. TD Banknorth N.A., Misc. No. 350750 (Mass.Land.Ct., March 22, 2010) (defendant was es-topped from establishing the priority of its mortgage where the plaintiff had extended funds for a refinance and assumed they would have priority, in reliance on written representations from the plaintiff regarding the amount of the lien discharge). Additionally silence in the face of an explicit contrary assumption by an innocent party may induce reliance for purposes of estoppel. See Renovators Supply, Inc. v. Sovereign Bank, 72 Mass.App.Ct. 419, 427 (2008) (the defendant was es-topped from terminating the plaintiffs line of credit without reasonable notice where its conduct/silence had led the plaintiff to believe the renewal under the same conditions was assured).
Longobardi’s silence regarding the outstanding Medway Lumber Mortgage conveyed the inaccurate impression to Quicken’s title analyst that the loan had been discharged. It was reasonable for the analyst to assume that, had Medway still held an outstanding mortgage on the property, Longobardi would have informed her at that time. Additionally, when BNY initiated foreclosure proceedings on the Property following Berthiaume’s bankruptcy, and noticed that the Medway Lumber Mortgage Discharge had still not been recorded, they again contacted Longobardi to request a confirmation of the Medway Lumber Discharge and received no response from Longobardi.
Quicken was relying upon the same Medway Lumber Discharge that had been prepared, signed, notarized, and faxed to CCO’s agent by Longobardi, in assuring that it would have priority following a refi *131 nance. Estoppel may be appropriate even where the action was intended to induce reliance by a third party. Moran v. Gala, 66 Mass.App.Ct. at 140 n.10 (2006). The fact that a copy of the Medway Lumber Discharge was provided to Quicken’s title agent by Berthiaume rather than Longobardi is insignificant. The Medway Lumber Discharge was executed by Lon-gobardi and delivered by him to both CCO’s title agent and to Berthiaume. In faxing the unconditional discharge to the agent of CCO Longobardi placed it into the stream of commerce. The discharge indicated that the Medway Lumber Mortgage had been satisfied and reliance on its authenticity induced Quicken to move forward with extending the funds for a refinance under the assumption that it would have priority.
This court finds that the application of equitable estoppel in this case is consistent with the doctrine’s purpose of preventing results that are contrary to good conscience and fair dealing. Despite the fact that he had executed and faxed a discharge for the Medway Lumber Mortgage, that in no way indicated it was contingent on payment, to Residential Title and had provided an original copy to Berthiaume, at no point did Longobardi attempt to inform CCO, Quicken, or BNY, all of whom contacted him directly or through a title agent attempting to clear title, that the Medway Lumber Mortgage had not in fact been discharged.[9] This court concludes that Medway should not be able to benefit from its inaccurate and misleading representation and therefore is estopped from asserting the priority of its lien over the mortgage now held by BNY.
B. DOCTRINE OF EQUITABLE SUBROGATION
This court also finds that Medway Lumber’s lien position is subordinated to that of BNY by virtue of the doctrine of equitable subrogation. In Massachusetts, the doctrine of equitable subrogation allows the “new mortgage given by a mortgagor, who used the proceeds of the new mortgage to extinguish an earlier mortgage, [to] receive the same priority once given to the earlier mortgagor.” East Boston Savings Bank v. Ogan, 428 Mass. 327, 330 (1998). Equitable subrogation allows the new mortgagee to step into the shoes of the prior mortgagee or lien holder, for purposes of establishing priority of its new mortgage over an intervening mortgage or lien. As the Supreme Judicial Court stated: “one who fully performs an obligation of another, secured by a mortgage, becomes, by subrogation, the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment. Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.” Id., quoting Restatement (Third) of Property (Mortgages) §7.6(a) (1997). A court must determine the following in order for equitable subrogation to apply: (1) the subrogee made the payment to protect his or her own interest, (2) the subrogee did not act as a volunteer, (3) the subrogee was not primarily liable for the debt paid, (4) the subrogee paid off the entire encumbrance, and (5) subrogation would not work any injustice to the rights of the junior lien holder. Id.
It is undisputed that factors one through four are present in this case. Quicken paid off the CCO Mortgage' to protect its own interest in its mortgage (which is now held by BNY) and therefore did not act as a volunteer and Quicken was not primarily liable for the CCO Mortgage. Therefore, it is the fifth factor that is disputed here. In determining whether subrogation would work an injustice on the rights of the junior lien holder, the court must ensure that the intervening mortgagee does not receive a lower priority as a result of the subrogee’s mistake, as well as ensure that they are not unjustly enriched by succeeding to first priority. East Boston Savings Bank v. Ogan, 428 Mass. at 330. Furthermore, subrogation will not apply to the extent that it prejudices the intervening mortgagee. Id.
Here, Medway at all times was subject to a prior mortgage and the specific language of the Medway Lumber Mortgage indicated as much. Therefore, as a subrogee to BNY their position is no different from what they bargained for originally in taking a non-priority lien. When they executed the Medway Lumber Mortgage they intended to occupy a subordinate position to a first mortgage and therefore chose to bear the risks inherent to a junior lienholder. See Provident Co-op Bank v. James Talcott, Inc., 358 Mass. 180, 190 (1970). In fact, if equitable subrogation is not applied then Medway as the original junior lienholder will be unjustly enriched as they will ascend to first priority through no act of their own. See East Boston Savings Bank v. Ogan, 428 Mass. at 334. See also Boston Five Cents Savings Bank v. Baybank, Misc.No. 185194 (Mass.Land.Ct., March 12, 1993).
Medway Lumber contends that equitable subrogation should not apply as it was prejudiced by the actions of Quicken (and as such BNY) as evidenced by the fact that Quicken had actual knowledge of the Medway Lumber Mortgage, yet did not request that Medway Lumber subordinate to them. They claim that this act deprived Medway Lumber of the opportunity to demand that its mortgage be paid in full or have its debt balance reduced as additional security for its loan. There is no “bright line" rule concerning subrogee knowledge, actual or constructive; indeed knowledge is not necessarily fatal to a claim of subrogation. East Boston Savings Bank, 428 Mass. at 334. The degree of knowledge attributable to a subrogee concerning the existence of an intervening mortgage may nullify equitable subrogation and the subrogee’s behavior is an important consideration that the court must balance in its equitable analysis of the interests of both mortgagees. Id. at 331-32.
Here, the intervening mortgage held by Medway Lumber was discovered by Quicken’s title search agent during a title search of the Property. However, as previously discussed Quicken’s title analyst Ervin did attempt to ensure that the Medway Lumber Mortgage, that Quicken relied on, had been unconditionally discharged and in *132 doing so relied on a copy of the Medway Lumber Discharge, executed by Longogardi, that it received from Berthiaume. While Ervin never took any additional measures to ensure that the discharge was accurate, despite the fact that it had been executed seven months earlier and was still unrecorded, there is no suggestion that Quicken had actual knowledge of the fact that the Medway Lumber Discharge was inaccurate. The court has indicated that it finds reliance on such discharge notices to be reasonable in the context of a real estate closing. The Massachusetts Supreme Judicial Court has also noted that “negligence of one which does not induce a change of position of another is not a bar to recovery in cases of subrogation.’’ Id. at 332, quoting from Worcester N. Sav. Inst. v. Farwell, 292 Mass. 568, 574 (1935). See also Provident Co-op Bank, 358 Mass. at 189. Although the court does not find that Quicken acted negligently in its reliance on the Medway Lumber Discharge, we also note that there was no evidence presented suggesting that any alleged negligence by Quicken in not confirming the accuracy of the Medway Lumber Discharge induced a change of position by Medway. In fact as previously mentioned, at all times they held the position of ajunior lienholder and did not appear to rely on an assumption that they had first priority in their subsequent decisions to extend additional loans to Berthiaume. See Wells Fargo v. National Lumber Co., 76 Mass.App.Ct. 1, 3-4, 8 (2009) (a change of position in reliance on negligent act may have existed where there was evidence that lender who took a second mortgage on property in reliance on first priority status after first mortgage was paid off in extending additional funds, secured by its mortgage, to the borrower).
Medway Lumber also claims that it has been prejudiced in that it was not given the opportunity to subordinate to the Quicken loan (now held by BNY) which was an interest only, non-income verification loan that was substantially more than the original Citizens loan that they had originally been subordinate to. However, subrogation is limited to the rights, remedies, or security enjoyed by the original creditor. Wells Fargo, 76 Mass.App.Ct at 5, quoting East Boston Savings Bank, 428 Mass. at 328-29. Therefore, under the doctrine of equitable subrogation BNY’s priority is limited to the $200,372.45 that was provided by Quicken (the original holder of the BNY loan) to pay off the CCO Loan. This $200,372.45 is not substantially different from the Citizens Loan of $199,400 that Medway had originally been subordinate to and as such their position is not substantially different from what it was when Citizens held the first priority lien.[10]
The court finds therefore, that the BNY mortgage has first priority over the Medway Lumber Mortgage for the full amount of the lien based on the doctrine of equitable estoppel, and for the amount of the CCO loan payoff based on the doctrine of equitable sub-rogation.
ORDER
For the foregoing reasons, it is hereby ORDERED that judgment enter for the plaintiffs, Bank of New York, as Trustee for the Certificate Holders of CWALT, Inc., Asset-Backed Certificates, Series 2007-02CB, establishing that their lien on property located at 57 North Avenue, Mendon, Massachusetts, holds first priority position.

Plaintiffs waived the Constructive Discharge and Unjust Enrichment claims contained in their original complaint and amended complaint.

On February 13, 1997, the Medway Lumber Profit Sharing Trust (the “Profit Sharing Trust”) lent Berthiaume $75,000 (the “1997 Loan”) to purchase the Property. On that date, Berthiaume executed a promissory note in the amount of $75,000 in favor of Longobardi and his brother, Paul Longobardi, the Trustees of the Profit Sharing Trust (the “1997 Medway Lumber Trust Note”), which was secured by a mortgage on the Property (the “1997 Medway Lumber Trust Mortgage”). By deed dated February 13, 1997, Berthiaume received title to the Property. The Property was eventually deeded to both Earl and Elizabeth Berthiaume.

In their 2006 tax return, the Berthiaumes represented to the Internal Revenue Service (“IRS”) that their yearly income was negative $21,975. (Exhibit 54.) Even without deductions, the Berthiaumes’ income was not $10,000 per month in 2006. (Exhibit 54.)

Although the Berthiaumes had paid off the 1997 Loan in 2001, there was no discharge of record for the 1997 Mortgage at this time.

Quicken issued another loan to Berthiaume on or about January 11, 2007 in the amount of $100,000. However, I find that this loan is irrelevant to the claims at issue because there is no evidence that BNY holds this loan nor has it attempted to assert priority of this lien over the Medway Lumber Mortgage.

Berthiaume was unable to execute the note and mortgage since he had filed bankrupty. (Longobardi Testimony.)

The court also notes Longobardi’s questionable lending practices in relation to the Berthiaumes. Despite the fact that the Berthiaumes were in default on the Medway Lumber Loan, Longobardi took no measures to collect the balance on the loan and instead, continued to advance the Berthiaumes additional funds. Even after learning that Berthiaumes had filed bankruptcy, Longobardi continued to extend him funds and made no attempt to ensure that Berthiaumes had the ability to repay such loans. Finally, after learning that BNY, the current holder of the Quicken mortgage, was attempting to foreclose on the property Longobardi made no attempt to foreclose on the Medway Lumber Mortgage or to assert a claim of priority and in fact waited nearly nine months to send Berthiaumes its first notice of default (which was two years from the actual default date).

There is no clear Massachusetts appellate authority on the question of whether or not the doctrine of equitable subrogation extends to amounts such as accrued interest and costs minus principal payments, due under a mortgage, or is instead limited only to the principal amount of the mortgage repaid by the refinancing lender. This court declines to address the issue here, as it finds that the defendant is entitled to priority based on the doctrine of equitable estoppel and therefore is entitled to recovery of the full amount of its lien.